UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FOOTBALL NORTHWEST, LLC d/b/a
SEATTLE SEAHAWKS and NATIONAL
FOOTBALL LEAGUE MANAGEMENT
COUNCIL,

              Plaintiffs,

vs.

MALIK McDOWELL and NATIONAL
FOOTBALL LEAGUE PLAYERS
ASSOCIATION

              Defendants.

Case No. 2:19-cv-11588-
RHC-RSW

Hon. Robert H. Cleland

**AFFIRMATION OF ANTHONY J. DREYER IN SUPPORT OF
PLAINTIFFS' MOTION TO CONFIRM AN ARBITRATION AWARD**

       ANTHONY J. DREYER, an attorney duly admitted to practice before

this Court, hereby affirms as follows:

       1.    I am a member of the bar of the State of New York and the law

firm of Skadden, Arps, Slate, Meagher & Flom LLP, counsel for Plaintiffs Seattle

Seahawks ("Seahawks") and the National Football League Management Council

("NFLMC").  I am fully familiar with the pleadings and proceedings in this case

and the matters set forth herein.

       2.    I submit this affirmation in support of Plaintiffs' Motion to

Confirm An Arbitration Award.

3.   Mr. McDowell entered into an NFL Player Contract with the Seahawks on May 30, 2017.  The McDowell Contract included the following language in paragraph 3:

> **Other Activities**. Without prior written consent of the Club, **Player will not . . . engage in any activity other than football which may involve a significant risk of personal injury**. (*Id.* (emphasis added).)

4.   Attached hereto as Exhibit B is a true and correct copy of the McDowell Contract.

5.   The parties are bound by the CBA negotiated between the NFLMC (on behalf of the NFL member clubs) and the National Football League Players Association ("NFLPA") (on behalf of all NFL players).

6.   Pursuant to Article 4, Section 9 of the CBA, a player who "is unavailable to the team due to a nonfootball injury that resulted from a material breach of paragraph 3 of his NFL Player Contract" shall be required to forfeit Signing Bonus for each League Year in which that breach occurs.

7.   The CBA mandates that disputes between the parties involving the forfeiture of signing bonuses be submitted to arbitration before a mutually selected System Arbitrator.

8.   Attached hereto as Exhibit C is a true and correct copy of excerpts from the 2011-2020 NFL Collective Bargaining Agreement.

9.   In July of 2017, Mr. McDowell suffered a non-football injury resulting from a breach of paragraph 3 of the McDowell Contract.

10.   The NFLMC, on behalf of the Seahawks, filed the underlying arbitration proceeding against Mr. McDowell on July 20, 2018 seeking forfeiture of his signing bonus allocations for 2017 to 2020 as a result of Mr. McDowell's breach of paragraph 3 of the McDowell Contract (the "Initiation Letter").

11.   Attached hereto as Exhibit D is a true and correct copy of the Initiation Letter.

12.   After negotiations with Mr. McDowell and the NFLPA, the Seahawks amended their arbitration demand on February 19, 2019 to seek only forfeiture of Mr. McDowell's 2017 and 2018 Signing Bonus Allocations.

13.   Attached hereto as Exhibit E is a true and correct copy of the Amended Initiation Letter.

14.   Accordingly, the NFLMC, on behalf of the Seahawks, filed a stipulated Proposed Order with System Arbitrator Burbank finding that Mr. McDowell had forfeited his right to the 2017 and 2018 Signing Bonus Allocations (totaling $1,599,238) and requiring Mr. McDowell to return $799,238 to the Seahawks, which amount represents the $1,599,238 forfeited, less the $800,000 of the Signing Bonus that the Club withheld after Mr. McDowell's accident (the "Proposed Order").

3

15.  On February 27, 2019, System Arbitrator Burbank conducted a telephonic arbitration hearing at which he reviewed the Proposed Order with Mr. McDowell, who was represented by counsel, and asked him to confirm he did not contest the forfeiture of the 2017 and 2018 Signing Bonus Allocations.  Mr. McDowell confirmed he did not contest the forfeiture for those two seasons.

16.  Attached hereto as Exhibit F is a true and correct copy of excerpts of the Arbitration Hearing Transcript, dated February 27, 2019.

17.  On February 27, 2019, an arbitral award ("Order") was issued pursuant to the National Football League Collective Bargaining Agreement ("CBA") by NFL System Arbitrator Professor Stephen B. Burbank in which Professor Burbank found that Mr. McDowell breached paragraph 3 of his NFL Player Contract and, as a result of his breach, was ordered to pay the Seattle Seahawks $799,238 within 30 days.

18.  Attached hereto as Exhibit A is a true and correct copy of the McDowell Order.

### Conclusion

For the reasons set forth in the accompanying memorandum of law in support of Plaintiffs' Motion, and based upon the documents attached hereto, Plaintiffs respectfully request the Court enter an Order granting the relief requested in the Motion.

Dated:  May 31, 2019

Respectfully submitted,

Anthony J. Dreyer

Exhibit A –
McDowell Order

NATIONAL FOOTBALL LEAGUE
MANAGEMENT COUNCIL

     Claimant,

     v.

NATIONAL FOOTBALL LEAGUE
PLAYERS ASSOCIATION,

     Respondent.

BEFORE SYSTEM ARBITRATOR
STEPHEN B. BURBANK

Re: Malik McDowell

## ORDER

1. The NFL Management Council ("NFLMC") initiated this proceeding on behalf of the Seattle Seahawks ("Seahawks") on July 20, 2018. The NFLMC amended its enforcement proceeding on February 19, 2019.

2. Malik McDowell ("McDowell") signed an NFL Player Contract with the Seahawks for the 2017 through 2020 League Years ("McDowell Contract").

3. Paragraph 3 of the McDowell Contract provided: "Other Activities. Without prior written consent of the Club, Player will not play football or engage in activities related to football otherwise than for Club or engage in any activity other than football which may involve a significant risk of personal injury. Player represents that he has special, exceptional and unique knowledge, skill, ability, and experience as a football player, the loss of which cannot be estimated with any certainty and cannot be fairly or adequately compensated by damages. Player therefore agrees that Club will have the right, in addition to any other right which Club may possess, to enjoin Player by appropriate proceedings from playing football or engaging in football-related activities other than for Club or from engaging in any activity other than football which may involve a significant risk of personal injury."

4. The McDowell Contract further provided that the Seahawks would pay McDowell a Signing Bonus of $3,198,476, which would be paid in four installments. Pursuant to the terms of the McDowell Contract, the Seahawks paid McDowell $1,598,476 of the

Signing Bonus on or before June 2, 2017 and $800,000 on July 14, 2017, for a total of $2,398,476. The final two installments (totaling $800,000) have not been paid.

5.  The McDowell Contract provided that the Signing Bonus was subject to forfeiture to the maximum extent permitted under Article 4, Section 9 of the Collective Bargaining Agreement ("CBA").

6.  In July of 2017, McDowell was riding an All-Terrain Vehicle ████████████████ ████████ As a result of the injuries sustained in that accident, McDowell was placed on the Non-Football Injury ("NFI") list on August 5, 2017. The Seahawks' team physician, after examining McDowell ████████████████████████████████████ ████████████████████████████████████ The Seahawks therefore did not clear McDowell to return to play and placed him on the NFI list, where he remains. As such, the Club was deprived of McDowell's services under his contract during the 2017 and 2018 NFL seasons.

7.  Through his actions in July of 2017, McDowell breached Paragraph 3 of the McDowell Contract due to his engagement in an activity that may involve significant risk of personal injury and which did in fact cause him to sustain a personal injury that prevented him from rendering playing services required by his contract during the 2017 and 2018 seasons.

8.  To date, McDowell's breach of Paragraph 3 of the McDowell Contract has deprived the Seahawks of his services under that contract for the 2017 and 2018 seasons.

9.  McDowell's breach of Paragraph 3 of the McDowell Contract constitutes a Forfeitable Breach under Article 4, Section 9 of the CBA.

10. To date, McDowell has forfeited his Signing Bonus Allocations for 2017 and 2018 under Article 4, Section 9 of the CBA. The Signing Bonus is allocated at $799,619 per year. As a result, McDowell has forfeited $1,599,238. McDowell is currently required to repay the Seahawks $799,238, which amount represents the $1,599,238 forfeited, less the $800,000 of the Signing Bonus that the Club withheld.

11. The NFLMC, on behalf of the Seahawks, reserves the right to initiate a separate enforcement proceeding seeking forfeiture of the remainder of McDowell's Signing Bonus (totaling $1,599,238) if, in the opinion of the Seahawks' team physician, ████████████████████████████████████████ ████████████████

12. Upon execution of this Order, the Seahawks will release McDowell from the McDowell Contract. McDowell acknowledges that the termination of the McDowell Contract in no way extinguishes or waives the Club's right to seek forfeiture of McDowell's remaining

2

Signing Bonus Allocations.  McDowell agrees that in any future forfeiture proceeding initiated against him by the Club to recover Signing Bonus Allocations, the Player will not assert that his contract termination bars the Club from recovery.

THEREFORE:

1.    McDowell is Ordered to pay to the Seahawks $799,238, which amount represents the 2017 and 2018 Signing Bonus Allocations forfeited by McDowell (totaling $1,599,238), less the $800,000 of the Signing Bonus that the Club withheld, within thirty (30) days of this Order.

SO ORDERED this **27** day of *February* 2019

STEPHEN B. BURBANK
System Arbitrator

4

# Exhibit B – McDowell Contract



# NFL PLAYER CONTRACT

THIS CONTRACT is between _____ **MALIK MCDOWELL** _____ , hereinafter
"Player," and _____ **FOOTBALL NORTHWEST LLC** _____ ,
a _____ Washington _____ limited liability company   hereinafter "Club," operating under
the name of the _____ SEATTLE SEAHAWKS _____ as a member of the National Football League,
hereinafter "League." In consideration of the promises made by each to the other, Player and Club agree as follows:

**1. TERM.** This contract covers ___4___ football season(s), and will begin on the date of execution or March 1, ___2017___ ,
whichever is later, and end on February 28 or 29, ___2021___ , unless extended, terminated, or renewed as specified elsewhere in this contract.

**2. EMPLOYMENT AND SERVICES.** Club employs Player as a skilled football player. Player accepts such employment. He
agrees to give his best efforts and loyalty to the Club, and to conduct himself on and off the field with appropriate recognition of the fact
that the success of professional football depends largely on public respect for and approval of those associated with the game. Player will
report promptly for and participate fully in Club's official mandatory minicamp(s), official preseason training camp, all Club meetings and
practice sessions, and all preseason, regular season and postseason football games scheduled for or by Club. If invited, Player will practice
for and play in any all-star football game sponsored by the League. Player will not participate in any football game not sponsored by the
League unless the game is first approved by the League.

**3. OTHER ACTIVITIES.** Without prior written consent of the Club, Player will not play football or engage in activities related
to football otherwise than for Club or engage in any activity other than football which may involve a significant risk of personal injury.
Player represents that he has special, exceptional and unique knowledge, skill, ability, and experience as a football player, the loss of which
cannot be estimated with any certainty and cannot be fairly or adequately compensated by damages. Player therefore agrees that Club will
have the right, in addition to any other right which Club may possess, to enjoin Player by appropriate proceedings from playing football or
engaging in football-related activities other than for Club or from engaging in any activity other than football which may involve a
significant risk of personal injury.

**4. PUBLICITY AND NFLPA GROUP LICENSING PROGRAM.**
(a) Player hereby grants to Club and the League, separately and together, the right and authority to use, and to authorize others to
use solely as described below, his name, nickname, initials, likeness, image, picture, photograph, animation, persona, autograph/signature
(including facsimiles thereof), voice, biographical information and/or any and all other identifying characteristics (collectively, "Publicity
Rights"), for any and all uses or purposes that publicize and promote NFL Football, the League or any of its member clubs in any way in
any and all media or formats, whether analog, digital or other, now known or hereafter developed, including, but not limited to, print, tape,
disc, computer file, radio, television, motion pictures, other audio-visual and audio works, Internet, broadband platforms, mobile platforms,
applications, and other distribution platforms. Without limiting the foregoing, this grant includes the right to use Player's Publicity Rights
for the purpose of publicizing and promoting the following aspects of NFL Football, the League and/or any of its member clubs: brands,
games, ticket sales, game broadcasts and telecasts, programming focused on the NFL, one or more NFL clubs and/or their games and
events (e.g., coaches shows, highlight based shows such as *Inside the NFL*, behind-the-scenes programming such as *Hard Knocks*), other
NFL-related media offerings (e.g., branded content segments featuring NFL game footage and other programming enhancements), media
distribution platforms (e.g., NFL.com, NFL Mobile, NFL Network), official events (e.g., NFL Kickoff, NFL Draft), officially sanctioned
awards programs (e.g., Rookie of the Year), and public service or community oriented initiatives (e.g., Play60). For purposes of clarity, the
foregoing grant of rights includes the right and authority to use, and to authorize affiliates or business partners to use, after the term of this
Agreement any Publicity Rights fixed in a tangible medium (e.g., filmed, photographed, recorded or otherwise captured) during the term of
this Agreement solely for the purposes described herein. Notwithstanding anything to the contrary, the foregoing grant does not confer,
during or after the term of this Agreement, any right or authority to use Player's Publicity Rights in a manner that constitutes any
endorsement by Player of a third-party brand, product or service ("Endorsement"). For purposes of clarity, and without limitation, it shall
not be an Endorsement for Club or the League to use, or authorize others to use, including, without limitation, in third party advertising
and promotional materials, footage and photographs of Player's participation in NFL games or other NFL events that does not unduly
focus on, feature, or highlight, Player in a manner that leads the reasonable consumer to believe that Player is a spokesperson for, or
promoter of, a third-party commercial product or service.

Player will cooperate with the news media, and will participate upon request in reasonable activities to promote the Club and the League.

Player and National Football League Players Association, including any of its affiliates ("NFLPA) do not and will not contest during or
after the term of this agreement, and they hereby confirms their acknowledgment of, the exclusive rights of the League, Club and any NFL
member club (i) to telecast, broadcast, or otherwise distribute, transmit or perform, on a live, delayed, or archived basis, in any and all
media now known or hereafter developed, any NFL games or any excerpts thereof and (ii) to produce, license, offer for sale, sell, market,
or otherwise distribute or perform (or authorize a third party to do any of the foregoing), on a live, delayed, or archived basis, any NFL
games or any excerpts thereof, in any and all media now known or hereafter developed, including, but not limited to, packaged or other
electronic or digital media.

1

Nothing herein shall be construed to grant any Publicity Rights for use in licensed consumer products, whether traditional or digital (e.g., video games, trading cards, apparel), other than such products that constitute programming (as described herein) or news and information offerings regardless of medium (e.g., DVDs, digital highlight offerings).

(b) Player hereby assigns the NFLPA and its licensing affiliates, if any, the exclusive and unlimited right to use, license and sublicense the right to use his name, nickname, initials, autograph/signature (including facsimiles), voice, picture, photograph, animation, image, likeness, persona, jersey number, statistics, data, copyrights, biographical information and/or other personal indicia (individually and collectively, "Rights") for use in connection with any product, brand, service, appearance, product line or other commercial use and any sponsorship, endorsement or promotion thereof, when more than five (5) NFL player Rights are involved, regardless of team affiliation and whether that number is reached using player Rights simultaneously or individually, in any form, media, or medium (now known or hereafter developed) during a consecutive 12-month period (a "group licensing program"). For sponsorships, endorsements, and promotions, group licensing programs are further defined as those: (a) in any one product category, as defined by industry standards; or (b) in different categories if the products all use similar or derivative design or artwork, or one player product is used to promote another player product.

The Rights may also be used for the promotion of the NFLPA, its affiliated entities and/or its designees (the "NFLPA Entities"), provided such promotion does not constitute an endorsement by Player of a commercial product not a part of a group licensing program. Player agrees to participate, upon request of the NFLPA and without additional compensation, in reasonable activities to promote the NFLPA Entities, which shall include (i) up to three (3) personal appearances per year or (ii) up to fifteen (15) minutes per week dedicated to promoting the NFLPA Entities. Player retains the right to grant permission to others to utilize his Rights if that individual or entity is not concurrently utilizing the Rights of five (5) or more other NFL players for any commercial purpose whatsoever. If Player's inclusion in an NFLPA program is precluded by an individual exclusive endorsement agreement, and Player provides the NFLPA with immediate written notice of that preclusion, the NFLPA agrees to exclude Player from that particular program. Should Player fail to perform any of his obligations hereunder, the NFLPA may withhold payments owed to Player, if any, in connection with this Group Licensing Assignment.

In consideration for this assignment of rights, the NFLPA agrees to use the revenues it receives from group licensing programs to support the objectives as set forth in the Bylaws of the NFLPA and as otherwise determined by the NFLPA Board. The NFLPA further agrees to use reasonable efforts to promote the use of NFL player Rights in group licensing programs, to provide group licensing opportunities to all NFL players, and to monitor and police unauthorized third-party use of the Rights. The NFLPA makes no representations regarding group licensing other than those expressed herein. This agreement shall be construed under Virginia law.

The assignment in this paragraph shall expire on December 31 of the latter of (i) the third year following the execution of this contract, or (ii) the year after this contract expires, and may not be revoked, terminated or otherwise assigned in any manner by Player until such date. Neither Club nor the League is a party to the terms of this paragraph, which is included herein solely for the administrative convenience and benefit of Player and the NFLPA. Nothing in Paragraph 4b shall be construed or deemed to modify in any way the rights set forth in Paragraph 4a, and the fact that Paragraph 4b (or any of the terms thereof) appears in the Player Contract shall not be referred to, relied upon, or otherwise cited by Player and/or the NFLPA or any of its affiliates in any dispute or legal proceeding as evidence that the NFL, any NFL entity, any Club or Club Affiliate, or any licensee of any of the foregoing has consented, agreed, acknowledged, or does not contest the applicability or interpretation of Paragraph 4b.

**5. COMPENSATION.** For performance of Player's services and all other promises of Player, Club will pay Player a yearly salary as follows:

$ __465,000__ /*_____ for the 20 _17_ season;

$ __781,155__ /*_____ for the 20 _18_ season;

$ __1,097,310__ /*_____ for the 20 _19_ season;

$ __1,413,465__ /*_____ for the 20 _20_ season;

$ _____ /*_____ for the 20 ____ season;

$ _____ /*_____ for the 20 ____ season;

$ _____ /*_____ for the 20 ____ season;

$ _____ /*_____ for the 20 ____ season;

$ _____ /*_____ for the 20 ____ season;

$ _____ /*_____ for the 20 ____ season;

$ _____ /*_____ for the 20 ____ season;

$ _____ /*_____ for the 20 ____ season.

(* - designates the compensation Club will pay player if the player is not on Club's Active/Inactive List)

In addition, Club will pay Player such earned performance bonuses as may be called for in this contract; Player's necessary traveling expenses from his residence to training camp; Player's reasonable board and lodging expenses during preseason training and in connection with playing preseason, regular season, and postseason football games outside Club's home city; Player's necessary traveling expenses to and from preseason, regular season, and postseason football games outside Club's home city; Player's necessary traveling expenses to his residence if this contract is terminated by Club; and such additional compensation, benefits and reimbursement of expenses as may be called for in any collective bargaining agreement in existence during the term of this contract. (For purposes of this contract, a collective bargaining agreement will be deemed to be "in existence" during its stated term or during any period for which the parties to that agreement agree to extend it.)

6. **PAYMENT.** Unless this contract or any collective bargaining agreement in existence during the term of this contract specifically provides otherwise, Player will be paid 100% of his yearly salary under this contract in equal weekly or biweekly installments over the course of the applicable regular season period, commencing with the first regular season game played by Club in each season. Unless this contract specifically provides otherwise, if this contract is executed or Player is activated after the beginning of the regular season, the yearly salary payable to Player will be reduced proportionately and Player will be paid the weekly or biweekly portions of his yearly salary becoming due and payable after he is activated. Unless this contract specifically provides otherwise, if this contract is terminated after the beginning of the regular season, the yearly salary payable to Player will be reduced proportionately and Player will be paid the weekly or bi weekly portions of his yearly salary having become due and payable up to the time of termination.

7. **DEDUCTIONS.** Any advance made to Player will be repaid to Club, and any properly levied Club fine or Commissioner fine against Player will be paid, in cash on demand or by means of deductions from payments coming due to the Player under this contract, the amount of such deductions to be determined by Club unless this contract or any collective bargaining agreement in existence during the term of this contract specifically provides otherwise.

8. **PHYSICAL CONDITION.** Player represents to Club that he is and will maintain himself in excellent physical condition. Player will undergo a complete physical examination by the Club physician upon Club request, during which physical examination Player agrees to make full and complete disclosure of any physical or mental condition known to him which might impair his performance under this contract and to respond fully and in good faith when questioned by the Club physician about such condition. If Player fails to establish or maintain his excellent physical condition to the satisfaction of the Club physician, or make the required full and complete disclosure and good faith responses to the Club physician, then Club may terminate this contract.

9. **INJURY.** Unless this contract specifically provides otherwise, if Player is injured in the performance of his services under this contract and promptly reports such injury to the Club physician or trainer, then Player will receive such medical and hospital care during the term of this contract as the Club physician may deem necessary, and will continue to receive his yearly salary for so long, during the season of injury only and for no subsequent period covered by this contract, as Player is physically unable to perform the services required of him by this contract because of such injury. If Player's injury in the performance of his services under this contract results in his death, the unpaid balance of his yearly salary for the season of injury will be paid to his stated beneficiary, or in the absence of a stated beneficiary, to his estate.

10. **WORKERS' COMPENSATION.** Any compensation paid to Player under this contract or under any collective bargaining agreement in existence during the term of this contract for a period during which he is entitled to workers' compensation benefits by reason of temporary total, permanent total, temporary partial, or permanent partial disability will be deemed an advance payment of workers' compensation benefits due Player, and Club will be entitled to be reimbursed the amount of such payment out of any award of workers' compensation.

11. **SKILL, PERFORMANCE AND CONDUCT.** Player understands that he is competing with other players for a position on Club's roster within the applicable player limits. If at any time, in the sole judgment of Club, Player's skill or performance has been unsatisfactory as compared with that of other players competing for positions on Club's roster, or if Player has engaged in personal conduct reasonably judged by Club to adversely affect or reflect on Club, then Club may terminate this contract. In addition, during the period any salary cap is legally in effect, this contract may be terminated if, in Club's opinion, Player is anticipated to make less of a contribution to Club's ability to compete on the playing field than another player or players whom Club intends to sign or attempts to sign, or another player or players who is or are already on Club's roster, and for whom Club needs room.

**12. TERMINATION.** The rights of termination set forth in this contract will be in addition to any other rights of termination allowed either party by law. Termination will be effective upon the giving of written notice, except that Player's death, other than as a result of injury incurred in the performance of his services under this contract, will automatically terminate this contract. If this contract is terminated by Club and either Player or Club so requests, Player will promptly undergo a complete physical examination by the Club physician.

**13. INJURY GRIEVANCE.** Unless a collective bargaining agreement in existence at the time of termination of this contract by Club provides otherwise, the following Injury Grievance procedure will apply: If Player believes that at the time of termination of this contract by Club he was physically unable to perform the services required of him by this contract because of an injury incurred in the performance of his services under this contract, Player may, within 60 days after examination by the Club physician, submit at his own expense to examination by a physician of his choice. If the opinion of Player's physician with respect to his physical ability to perform the services required of him by this contract is contrary to that of the Club's physician, the dispute will be submitted within a reasonable time to final and binding arbitration by an arbitrator selected by Club and Player or, if they are unable to agree, one selected in accordance with the procedures of the American Arbitration Association on application by either party.

**14. RULES.** Player will comply with and be bound by all reasonable Club rules and regulations in effect during the term of this contract which are not inconsistent with the provisions of this contract or of any collective bargaining agreement in existence during the term of this contract. Player's attention is also called to the fact that the League functions with certain rules and procedures expressive of its operation as a joint venture among its member clubs and that these rules and practices may affect Player's relationship to the League and its member clubs independently of the provisions of this contract.

**15. INTEGRITY OF GAME.** Player recognizes the detriment to the League and professional football that would result from impairment of public confidence in the honest and orderly conduct of NFL games or the integrity and good character of NFL players. Player therefore acknowledges his awareness that if he accepts a bribe or agrees to throw or fix an NFL game; fails to promptly report a bribe offer or an attempt to throw or fix an NFL game; bets on an NFL game; knowingly associates with gamblers or gambling activity; uses or provides other players with stimulants or other drugs for the purpose of attempting to enhance on-field performance; or is guilty of any other form of conduct reasonably judged by the League Commissioner to be detrimental to the League or professional football, the Commissioner will have the right, but only after giving Player the opportunity for a hearing at which he may be represented by counsel of his choice, to fine Player in a reasonable amount; to suspend Player for a period certain or indefinitely; and/or to terminate this contract.

**16. EXTENSION.** Unless this contract specifically provides otherwise, if Player becomes a member of the Armed Forces of the United States or any other country, or retires from professional football as an active player, or otherwise fails or refuses to perform his services under this contract, then this contract will be tolled between the date of Player's induction into the Armed Forces, or his retirement, or his failure or refusal to perform, and the later date of his return to professional football. During the period this contract is tolled, Player will not be entitled to any compensation or benefits. On Player's return to professional football, the term of this contract will be extended for a period of time equal to the number of seasons (to the nearest multiple of one) remaining at the time the contract was tolled. The right of renewal, if any, contained in this contract will remain in effect until the end of any such extended term.

**17. ASSIGNMENT.** Unless this contract specifically provides otherwise, Club may assign this contract and Player's services under this contract to any successor to Club's franchise or to any other Club in the League. Player will report to the assignee Club promptly upon being informed of the assignment of his contract and will faithfully perform his services under this contract. The assignee club will pay Player's necessary traveling expenses in reporting to it and will faithfully perform this contract with Player.

**18. FILING.** This contract will be valid and binding upon Player and Club immediately upon execution. A copy of this contract, including any attachment to it, will be filed by Club with the League Commissioner within 10 days after execution. The Commissioner will have the right to disapprove this contract on reasonable grounds, including but not limited to an attempt by the parties to abridge or impair the rights of any other club, uncertainty or incompleteness in expression of the parties' respective rights and obligations, or conflict between the terms of this contract and any collective bargaining agreement then in existence. Approval will be automatic unless, within 10 days after receipt of this contract in his office, the Commissioner notifies the parties either of disapproval or of extension of this 10-day period for purposes of investigation or clarification pending his decision. On the receipt of notice of disapproval and termination, both parties will be relieved of their respective rights and obligations under this contract.

**19. DISPUTES.** During the term of any collective bargaining agreement, any dispute between Player and Club involving the interpretation or application of any provision of the NFL collective bargaining agreement or this contract will be submitted to final and binding arbitration in accordance with the procedure called for in any collective bargaining agreement in existence at the time the event giving rise to any such dispute occurs.

**20. NOTICE.** Any notice, request, approval or consent under this contract will be sufficiently given if in writing and delivered in person or mailed (certified or first class) by one party to the other at the address set forth in this contract or to such other address as the recipient may subsequently have furnished in writing to the sender.

**21. OTHER AGREEMENTS.** This contract, including any attachment to it, sets forth the entire agreement between Player and Club and cannot be modified or supplemented orally. Player and Club represent that no other agreement, oral or written, except as attached to or specifically incorporated in this contract, exists between them. The provisions of this contract will govern the relationship between Player and Club unless there are conflicting provisions in any collective bargaining agreement in existence during the term of this contract, in which case the provisions of the collective bargaining agreement will take precedence over conflicting provisions of this contract relating to the rights or obligations of either party.

**22. LAW.** This contract is made under and shall be governed by the laws of the State of  WASHINGTON  .

**23. WAIVER AND RELEASE.** Player waives and releases: (i) any claims relating to the 2011 lockout; (ii) any antitrust claims relating to the Draft, restrictions on free agency, franchise player designations, transition player designations, the Entering Player Pool, the Rookie Compensation Pool, or any other term or condition of employment relating to conduct engaged in prior to the date of this Agreement; and (iii) any claims relating to conduct engaged in pursuant to the express terms of any collective bargaining agreement during the term of any such agreement. This waiver and release also extends to any conduct engaged in pursuant to the express terms of the Stipulation and Settlement Agreement in *White*. This waiver and release does not waive any rights player may have to commence a grievance under the 2006 CBA or to commence a grievance or other arbitration under the 2011 CBA.

**24. OTHER PROVISIONS.**

(a) Each of the undersigned hereby confirms that (i) this contract, renegotiation, extension or amendment sets forth all components of the player's remuneration for playing professional football (whether such compensation is being furnished directly by the Club or by a related or affiliated entity); and (ii) there are not undisclosed agreements of any kind, whether express or implied, oral or written, and there are no promises, undertakings, representations, commitments, inducements, assurances of intent, or understandings of any kind that have not been disclosed to the NFL involving consideration of any kind to be paid, furnished or made available to Player or any entity or person owned or controlled by, affiliated with, or related to Player, either during the term of this contract or thereafter.

(b) Each of the undersigned further confirms that, except as separately set forth in any attachment submitted herewith consistent with the Collective Bargaining Agreement, the .pdf NFL Player Contract Form as set forth herein has not been modified from the form officially authorized for use by the NFL and the NFLPA.

(c) Each of the undersigned further confirms that, except insofar as any of the undersigned may describe in an addendum to this contract, to the best of their knowledge, no conduct in violation of the Anti-Collusion rules took place with respect to this contract. Each of the undersigned further confirms that nothing in this contract is designed or intended to defeat or circumvent any provisions of the collective bargaining agreement dated August 4, 2011, including but not limited to the Rookie Compensation Pool and Salary Cap provisions; however, any conduct permitted by that Agreement shall not be considered a violation of this confirmation.

(d) PERFORMANCE-BASED PAY. Player's attention is called to the fact that he may be entitled to Performance-Based Pay in accordance with the procedures outlined in Article 28, and that his eligibility for such pay is based on a formula that takes into account his playtime percentage and compensation.

**25. SPECIAL PROVISIONS.**

See attached addenda.

THIS CONTRACT is executed in six (6) copies. Player acknowledges that before signing this contract he was given the opportunity to seek advice from or be represented by persons of his own selection.

_(signature)_
PLAYER SIGNATURE

MALIK MCDOWELL
PLAYER PRINT

22158 Averhill St          48336
PLAYER HOME ADDRESS

Farmington Hills MI
_____

313-702-1862
TELEPHONE NUMBER

05/25/17
DATE

_(signature)_ Matthew H. Thomas
CLUB EXECUTIVE SIGNATURE

Matthew H. Thomas
CLUB EXECUTIVE PRINT

SEATTLE SEAHAWKS
CLUB NAME

12 SEAHAWKS WAY
CLUB ADDRESS

RENTON, WA 98056

5/25/17
DATE

_____
PLAYER'S AGENT SIGNATURE

Drew Rosenhaus
PLAYER'S AGENT PRINT

3921 Alton Road, Suite 440
ADDRESS

Miami Beach, FL  33140

305-936-1093
TELEPHONE NUMBER

_____
DATE

**Copy Distribution:**   Management Council (Original Signature)
Player, Member Club (Photocopy)
League Office, NFLPA, Player Agent (Electronic Mail)

## 25. SPECIAL PROVISIONS.

See attached addenda.

THIS CONTRACT is executed in six (6) copies. Player acknowledges that before signing this contract he was given the opportunity to seek advice from or be represented by persons of his own selection.

| | |
|---|---|
| _____ | _____ |
| PLAYER SIGNATURE | CLUB EXECUTIVE SIGNATURE |
| MALIK MCDOWELL | Matthew H. Thomas |
| PLAYER PRINT | CLUB EXECUTIVE PRINT |
| | SEATTLE SEAHAWKS |
| _____ | _____ |
| PLAYER HOME ADDRESS | CLUB NAME |
| | 12 SEAHAWKS WAY |
| _____ | CLUB ADDRESS |
| | RENTON, WA 98056 |
| _____ | _____ |
| TELEPHONE NUMBER | |
| _____ | _____ |
| DATE | DATE |

_____

PLAYER'S AGENT SIGNATURE

Drew Rosenhaus

PLAYER'S AGENT PRINT

3921 Alton Road, Suite 440

ADDRESS

Miami Beach, FL  33140

305-936-1093

TELEPHONE NUMBER

5/25/2017

DATE

Copy Distribution:   Management Council (Original Signature)
                     Player, Member Club (Photocopy)
                     League Office, NFLPA, Player Agent (Electronic Mail)

6

**ADDENDUM TO THE NFL PLAYER CONTRACT BETWEEN**
**SEATTLE SEAHAWKS ("CLUB") AND MALIK MCDOWELL ("PLAYER")**
**FOR THE CONTRACT YEAR <u>2017, 2018, 2019 and 2020</u>**

This Addendum is executed in conjunction with, attached to and made a part of the NFL Player Contract between Club and Player for the **<u>2017, 2018, 2019 and 2020</u>** NFL League Year(s) (the "Contract"). As used in this Addendum, the term "Regular Season" is defined to mean each NFL Regular Season occurring during the period covered by the Contract, with each such Regular Season being identified by the year in which it commences.

1.    <u>**2017 CONDITIONAL PARAGRAPH 5 SALARY GUARANTEE.**</u>

     1.1    <u>Skill, Injury & Salary Cap Guarantee</u>. Despite any contrary language in the NFL Player Contract and despite any one (1) of the following occurrences:

     A.    In Club's sole judgment, Player's skill or performance has been unsatisfactory as compared with that of other players competing for positions on Club's roster, and Player's Contract is terminated via the NFL waiver system; **OR**

     B.    Due to injury suffered while participating or playing for the Club while performing the services under Player's NFL Contract, in the sole discretion of Club's physician, Player is unable to pass Club's **2017** pre-season physical examination and Player's Contract is terminated via the NFL waiver system; **OR**

     C.    During the period an NFL salary cap is legally in effect, for salary cap purposes, Player's Contract is terminated via the NFL waiver system;

Club agrees that for the contract year **2017** only, it shall guarantee payment to Player **$465,000** of his scheduled **$465,000** salary provided in Paragraph 5 hereof. It is agreed and understood that the maximum guarantee of Paragraph 5 salary that may be attained by way of this clause is **$465,000**.

     1.2    <u>One Year Limitation</u>. This guarantee by Club shall not apply in any year after **2017**, regardless of whether Player is, as of this date, under contract or option to Club for a subsequent year; and regardless of whether Player passes Club's physical examination for a year subsequent to **2017**.

     1.3    <u>NFL Waiver System</u>. This guarantee in no way supersedes or obviates the applicability of the League's waiver system to Player.

     1.4    <u>Offset</u>. In the event this NFL Player Contract is terminated prior to or during the **2017** NFL regular season and Player subsequently has the opportunity to play for any professional football organization, Club's obligation hereunder shall be reduced by the amount of any and all compensation, including but not limited to salary and signing, reporting and/or incentive bonuses, earned by Player from such football organization(s) during the term of this guarantee and Player shall reimburse Club for any such amounts. Such offset shall be the maximum amount permitted by the terms of the Contract, this Addendum and the NFL Collective Bargaining Agreement dated August 4, 2011.

     1.5    <u>Player Default</u>. In the event, at any time prior to or during the **2017** League Year, for any reason whatsoever, Player fails or refuses to report to Club without its prior written consent, or



Player fails or refuses to practice or play with Club (except by reason of an NFL football-related injury as determined in the sole discretion of the Club physician which shall be final and binding, or by reason of death resulting from said NFL football-related injury as determined in the sole discretion of the Club physician which shall be final and binding), or Player fails or refuses to perform the services of the Contract or is unavailable to the Club due to incarceration, or Player fails or refuses to perform the services of his Contract or is unavailable to the Club due to a non-football injury sustained as a result of hazardous activity, or Player fails or refuses to perform the services of the Contract or is unavailable to the Club due to retirement, or Player leaves Club without its prior written consent, or Player is suspended by the NFL or Club for Conduct Detrimental (but excluding a suspension for no more than one game for a violation of the NFL Playing Rules), or Player is suspended for violation of the NFL Personal Conduct Policy, or Player is fined or suspended for violation of the NFL Policy and Program for Substances of Abuse, or Player is fined or suspended for violation of the NFL Policy on Anabolic Steroids and Related Substances, or the Contract is terminated for engaging in personal conduct reasonably judged by Club to adversely affect or reflect on Club, or Player otherwise breaches the Contract, Player will be in default of this Addendum.  Should Player be in default as defined herein, the guarantee of **2017** Paragraph 5 salary described herein shall immediately become null and void and Club shall not guarantee any payment of compensation to Player for the **2017** Contract Year.  In the case of such default, Player shall still be entitled to earn the **2017** salary stated in Paragraph 5 of the Contract on a weekly, non-guaranteed basis for as long as Player is on Club's roster and Player meets all customary criteria for earning such Paragraph 5 salary, subject to any applicable withholdings, deductions or fines.

     1.6    <u>Enforcement</u>.  To the extent any of the terms set forth above are deemed unenforceable under the NFL Collective Bargaining Agreement dated August 4, 2011, any forfeiture by Player under this Addendum shall be the maximum amount permitted by the terms of the Contract, this Addendum and the NFL Collective Bargaining Agreement dated August 4, 2011.  No term or condition of this Addendum, and no breach thereof, shall be waived, altered or modified except by written instrument.

     1.7    <u>Tax Implications</u>.  *If Player becomes entitled to the salary guarantee described herein, such guaranteed salary shall be paid no later than the earlier of:  (i) the date(s) prescribed by Paragraph 6 of the Contract (as if the Contract had not been terminated), or (ii) a date determined by Club that is no later than the last day of the "applicable 2½ month period" (as defined in Treas. Reg. § 1.409A-1(b)(4)(i)(A)) with respect to such guaranteed salary.  Any payment made before the payment date that would apply if not for termination of the Contract shall be discounted to the then-present value determined in accordance with the one-year Treasury Note rate published in The Wall Street Journal of February 1 of the calendar year in which the Contract is terminated (or, if The Wall Street Journal is not published on such February 1, then the last day before such February 1 on which The Wall Street Journal is published).*

## 2.   <u>2018 CONDITIONAL PARAGRAPH 5 SALARY GUARANTEE</u>.

     2.1    <u>Skill, Injury & Salary Cap Guarantee</u>.  Despite any contrary language in the NFL Player Contract and despite any one (1) of the following occurrences:

     A.    In Club's sole judgment, Player's skill or performance has been unsatisfactory as compared with that of other players competing for positions on Club's roster, and Player's Contract is terminated via the NFL waiver system; **OR**

ᗰ ᗰ



B.      Due to injury suffered while participating or playing for the Club while performing the services under Player's NFL Contract, in the sole discretion of Club's physician, Player is unable to pass Club's **2018** (or previous year) pre-season physical examination and Player's Contract is terminated via the NFL waiver system; **OR**

C.      During the period an NFL salary cap is legally in effect, for salary cap purposes, Player's Contract is terminated via the NFL waiver system;

Club agrees that for the contract year **2018** only, it shall guarantee payment to Player **$781,155** of his scheduled **$781,155** salary provided in Paragraph 5 hereof.  It is agreed and understood that the maximum guarantee of Paragraph 5 salary that may be attained by way of this clause is **$781,155**.

2.2     <u>One Year Limitation</u>.  This guarantee by Club shall not apply in any year after **2018**, regardless of whether Player is, as of this date, under contract or option to Club for a subsequent year; and regardless of whether Player passes Club's physical examination for a year subsequent to **2018**.

2.3     <u>NFL Waiver System</u>.  This guarantee in no way supersedes or obviates the applicability of the League's waiver system to Player.

2.4     <u>Offset</u>.  In the event this NFL Player Contract is terminated prior to or during the **2018** NFL regular season and Player subsequently has the opportunity to play for any professional football organization, Club's obligation hereunder shall be reduced by the amount of any and all compensation, including but not limited to salary and signing, reporting and/or incentive bonuses, earned by Player from such football organization(s) during the term of this guarantee and Player shall reimburse Club for any such amounts.  Such offset shall be the maximum amount permitted by the terms of the Contract, this Addendum and the NFL Collective Bargaining Agreement dated August 4, 2011.

2.5     <u>Player Default</u>.  In the event during the **2018** League Year, for any reason whatsoever, Player fails or refuses to report to Club without its prior written consent, or Player fails or refuses to practice or play with Club (except by reason of an NFL football-related injury as determined in the sole discretion of the Club physician which shall be final and binding, or by reason of death resulting from said NFL football-related injury as determined in the sole discretion of the Club physician which shall be final and binding), or Player fails or refuses to perform the services of the Contract or is unavailable to the Club due to incarceration, or Player fails or refuses to perform the services of his Contract or is unavailable to the Club due to a non-football injury sustained as a result of hazardous activity, or Player fails or refuses to perform the services of the Contract or is unavailable to the Club due to retirement, or Player leaves Club without its prior written consent, or Player is suspended by the NFL or Club for Conduct Detrimental (but excluding a suspension for no more than one game for a violation of the NFL Playing Rules), or Player is suspended for violation of the NFL Personal Conduct Policy, or Player is fined or suspended for violation of the NFL Policy and Program for Substances of Abuse, or Player is fined or suspended for violation of the NFL Policy on Anabolic Steroids and Related Substances, or the Contract is terminated for engaging in personal conduct reasonably judged by Club to adversely affect or reflect on Club, or Player otherwise breaches the Contract, Player will be in default of this Addendum.  Should Player be in default as defined herein, the guarantee of **2018** Paragraph 5 salary described herein shall immediately become null and void and Club shall not guarantee any payment of compensation to Player for the **2018** Contract Year.  In the case of such default, Player shall still be entitled to earn the **2018** salary stated in Paragraph 5 of the Contract on a weekly, non-guaranteed basis for as long as Player is on Club's roster and Player meets all customary



criteria for earning such Paragraph 5 salary, subject to any applicable withholdings, deductions or fines.

2.6 <u>Enforcement</u>.  To the extent any of the terms set forth above are deemed unenforceable under the NFL Collective Bargaining Agreement dated August 4, 2011, any forfeiture by Player under this Addendum shall be the maximum amount permitted by the terms of the Contract, this Addendum and the NFL Collective Bargaining Agreement dated August 4, 2011.  No term or condition of this Addendum, and no breach thereof, shall be waived, altered or modified except by written instrument.

2.7 <u>Tax Implications</u>.  *If Player becomes entitled to the salary guarantee described herein, such guaranteed salary shall be paid no later than the earlier of:  (i) the date(s) prescribed by Paragraph 6 of the Contract (as if the Contract had not been terminated), or (ii) a date determined by Club that is no later than the last day of the "applicable 2½ month period" (as defined in Treas. Reg. § 1.409A-1(b)(4)(i)(A)) with respect to such guaranteed salary.  Any payment made before the payment date that would apply if not for termination of the Contract shall be discounted to the then-present value determined in accordance with the one-year Treasury Note rate published in The Wall Street Journal of February 1 of the calendar year in which the Contract is terminated (or, if The Wall Street Journal is not published on such February 1, then the last day before such February 1 on which The Wall Street Journal is published).*

## 3. <u>2019 CONDITIONAL PARAGRAPH 5 SALARY GUARANTEE.</u>

3.1 <u>Skill, Injury & Salary Cap Guarantee</u>.  Despite any contrary language in the NFL Player Contract and despite any one (1) of the following occurrences:

A. In Club's sole judgment, Player's skill or performance has been unsatisfactory as compared with that of other players competing for positions on Club's roster, and Player's Contract is terminated via the NFL waiver system; **OR**

B. Due to injury suffered while participating or playing for the Club while performing the services under Player's NFL Contract, in the sole discretion of Club's physician, Player is unable to pass Club's **2019** (or previous year) pre-season physical examination and Player's Contract is terminated via the NFL waiver system; **OR**

C. During the period an NFL salary cap is legally in effect, for salary cap purposes, Player's Contract is terminated via the NFL waiver system;

Club agrees that for the contract year **2019** only, it shall guarantee payment to Player **$471,843** of his scheduled **$1,097,310** salary provided in Paragraph 5 hereof.  It is agreed and understood that the maximum guarantee of Paragraph 5 salary that may be attained by way of this clause is **$471,843**.

3.2 <u>One Year Limitation</u>.  This guarantee by Club shall not apply in any year after **2019**, regardless of whether Player is, as of this date, under contract or option to Club for a subsequent year; and regardless of whether Player passes Club's physical examination for a year subsequent to **2019**.

3.3 <u>NFL Waiver System</u>.  This guarantee in no way supersedes or obviates the applicability of the League's waiver system to Player.

MM



3.4     Offset.  In the event this NFL Player Contract is terminated prior to or during the **2019** NFL regular season and Player subsequently has the opportunity to play for any professional football organization, Club's obligation hereunder shall be reduced by the amount of any and all compensation, including but not limited to salary and signing, reporting and/or incentive bonuses, earned by Player from such football organization(s) during the term of this guarantee and Player shall reimburse Club for any such amounts.  Such offset shall be the maximum amount permitted by the terms of the Contract, this Addendum and the NFL Collective Bargaining Agreement dated August 4, 2011.

3.5     Player Default.  In the event during the **2019** League Year, for any reason whatsoever, Player fails or refuses to report to Club without its prior written consent, or Player fails or refuses to practice or play with Club (except by reason of an NFL football-related injury as determined in the sole discretion of the Club physician which shall be final and binding, or by reason of death resulting from said NFL football-related injury as determined in the sole discretion of the Club physician which shall be final and binding), or Player fails or refuses to perform the services of the Contract or is unavailable to the Club due to incarceration, or Player fails or refuses to perform the services of his Contract or is unavailable to the Club due to a non-football injury sustained as a result of hazardous activity, or Player fails or refuses to perform the services of the Contract or is unavailable to the Club due to retirement, or Player leaves Club without its prior written consent, or Player is suspended by the NFL or Club for Conduct Detrimental (but excluding a suspension for no more than one game for a violation of the NFL Playing Rules), or Player is suspended for violation of the NFL Personal Conduct Policy, or Player is fined or suspended for violation of the NFL Policy and Program for Substances of Abuse, or Player is fined or suspended for violation of the NFL Policy on Anabolic Steroids and Related Substances, or the Contract is terminated for engaging in personal conduct reasonably judged by Club to adversely affect or reflect on Club, or Player otherwise breaches the Contract, Player will be in default of this Addendum.  Should Player be in default as defined herein, the guarantee of **2019** Paragraph 5 salary described herein shall immediately become null and void and Club shall not guarantee any payment of compensation to Player for the **2019** Contract Year.  In the case of such default, Player shall still be entitled to earn the **2019** salary stated in Paragraph 5 of the Contract on a weekly, non-guaranteed basis for as long as Player is on Club's roster and Player meets all customary criteria for earning such Paragraph 5 salary, subject to any applicable withholdings, deductions or fines.

3.6     Enforcement.  To the extent any of the terms set forth above are deemed unenforceable under the NFL Collective Bargaining Agreement dated August 4, 2011, any forfeiture by Player under this Addendum shall be the maximum amount permitted by the terms of the Contract, this Addendum and the NFL Collective Bargaining Agreement dated August 4, 2011.  No term or condition of this Addendum, and no breach thereof, shall be waived, altered or modified except by written instrument.

3.7     Tax Implications.  *If Player becomes entitled to the salary guarantee described herein, such guaranteed salary shall be paid no later than the earlier of:  (i) the date(s) prescribed by Paragraph 6 of the Contract (as if the Contract had not been terminated), or (ii) a date determined by Club that is no later than the last day of the "applicable 2½ month period" (as defined in Treas. Reg. § 1.409A-1(b)(4)(i)(A)) with respect to such guaranteed salary.  Any payment made before the payment date that would apply if not for termination of the Contract shall be discounted to the then-present value determined in accordance with the one-year Treasury Note rate published in The Wall Street Journal of February 1 of the calendar year in which the Contract is terminated (or, if The Wall Street Journal is not published on such February 1, then the last day before such February 1 on which The Wall Street Journal is published).*





4.   **FULL FORCE:**   The Contract, together with this Addendum and all other addenda simultaneously executed herein, contains the entire agreement of the parties with respect to the matters agreed to, intended for, and provided for therein, and shall supersede any written instrument or oral agreement previously made or entered into by the parties to this Contract or their representatives. This Addendum modifies the Contract only to the extent specifically set forth herein.  All other aspects of the Contract, including any addenda thereto, remain unchanged and in full force and effect.  To the extent any of the terms set forth in this Addendum, the Contract and all other addenda are deemed unenforceable under the NFL Collective Bargaining Agreement dated August 4, 2011, such unenforceable terms shall be reduced to the extent necessary so that the terms, as so reduced, are enforceable (including, but not limited to, any provision relating to the repayment by Player to Club of any unearned portion of a bonus or any other compensation, which shall be reduced to the maximum amount permitted under the Contract and the NFL Collective Bargaining Agreement dated August 4, 2011), while all other terms and conditions of the Contract, this Addendum and all other addenda shall remain in full force and effect.  The invalidity or unenforceability of any provision of this Contract shall not affect the validity or enforceability of any other provision of this Contract, which shall remain in full force and effect.

5.   **CLAUSE HEADINGS:**   The clause headings appearing in this Addendum as well as the clause headings appearing elsewhere in the Contract and all other addenda have been inserted for the purpose of convenience and ready reference.  The headings do not purport to, and shall not be deemed to, define, limit or extend the scope or intent of the clauses to which they pertain nor any other substantive provision of the Contract.

6.   **WAIVER:**   No term or condition of this Contract, and no breach thereof, shall be waived, altered or modified except by written instrument executed by both parties.  No waiver shall be deemed to be a continuing waiver, but shall be only for the specific event.  The waiver of any default or breach of the Contract will not constitute a waiver of any other or subsequent default or breach.  No failure or delay on the part of Club in exercising any power or right under the Contract shall operate as a waiver thereof, nor shall any single or partial exercise of any such power or right preclude any other or further exercise thereof or the exercise of any other power or right.

7.   **INSURABLE INTEREST:**   Club has an insurable interest in Player, and Player agrees to cooperate reasonably with Club in all matters pertaining to said interest, including submission to physical examinations for insurance purposes.

8.   **CONFIDENTIALITY:**   The financial terms of the Contract and all corresponding addenda as well as any discussion regarding potential renegotiation or extension of the Contract shall be strictly confidential except as otherwise expressly provided.  Accordingly, Player and his representatives agree not to disclose any terms of said Contract or content of any contractually related discussions to the media, teammates or any other external sources.  Club shall only disclose the length of said Contract to external sources.  In addition, Club shall only disclose required components of said Contract to the National Football League, the NFL Players' Association and to the Player's certified representatives strictly on a need to know basis.

9.   **JURISDICTION AND GOVERNING LAW:**   This Contract and all of its terms and conditions was negotiated and agreed upon in the state of Washington and in no other state; its execution below is made in the state of Washington.  The parties hereby agree pursuant to R.C.W. 51.12.120(5) that employment is principally localized in the state of Washington. This Contract and

MM



any worker's compensation claims arising from performance hereunder shall be governed by the laws of the state of Washington. As such, Player and Club acknowledge and agree that the exclusive jurisdiction for resolving injury related claims shall be the Division of Workers' Compensation of Washington, and that any and all Workers' Compensation claims shall be subject to the worker's compensation laws of the state of Washington and of no other state. This Paragraph shall have no application to any injury sustained by Player after the Contract is assigned by waivers or trade to another club domiciled outside the state of Washington.

10. **REPRESENTATION AND WARRANTY:** Player hereby represents that he is not under contract to any other professional football league, or any other professional football club, and is free to negotiate and sign the Contract. Player also represents and warrants, as of the date hereof that, except as otherwise disclosed to Club, (i) Player has not been charged with, indicted for, convicted of or pled *nolo contendere* to any felony and/or misdemeanor involving fraud or moral turpitude; (ii) Player has not engaged in conduct which could subject Player to a charge, indictment or conviction of any such offense; (iii) no circumstances exist that would prevent Player's continuing availability to the Club for the duration of the Contract; and (iv) Player has made full and complete disclosure to Club of any physical or mental condition known to him which might impair his performance under the Contract and has responded fully and in good faith when questioned about his physical or mental condition. Player further recognizes that the Club is relying on such representations in entering into this Contract, and Player agrees that any such false representation shall be a material breach of the Contract, in which event the Club fully reserves all of its rights and remedies under the Contract and the NFL Collective Bargaining Agreement dated August 4, 2011.

11. **EXCLUSIVE SERVICES:** During the term of this Contract, neither Player nor Player's representatives will solicit offers from, negotiate with or enter into any agreement with any professional football team other than the Club to perform football-related services. The prohibition applies to all offers, contracts or negotiations regardless of whether or not the prospective services are to be performed by the Player after the expiration of this Contract. Furthermore, Player acknowledges that if, during the term of this Contract, Player or Player's representatives acting on Player's behalf were to negotiate and sign another contract to perform in the present or the future as a player for any other team in any other sport, the Club would be significantly injured, the costs of which cannot be estimated with certainty and for which injury the Club cannot be fairly or adequately compensated by financial damages. Therefore, Player agrees that if, during the term of this Contract, Player or Player's representatives solicit or entertain offers or negotiate or sign a contract to perform in the present or the future as a player for any other party in any sport, including but not limited to the National Football League, such action would materially breach this Contract and the Club will be entitled to a temporary restraining order and to an injunction restraining and enjoining the Player from negotiating, signing or performing such contract. Nothing in this provision shall be construed as prohibiting the Club from pursuing any remedies available to it for such breach, including the recovery of damages from the Player, inclusive of any and all expenses incurred by the Club directly or indirectly as a result of the Club's enforcement of this provision.

12. **ADDITIONAL PLAYER SERVICES:** For each contract and option year of this Contract, in addition to the base salary and other compensation stated in the Contract, the Player agrees to fulfill up to five (5) community relations/sponsor appearances or promotional activities on behalf of the Club. Such requests may include, but are not limited to, speaking engagements and personal appearances as a representative of the Club. Player and Club acknowledge that the maximum remuneration Player may receive for each such appearance made on Club's behalf shall be the prevailing commercial rate not to





exceed Five Thousand Dollars ($5,000.00) per appearance or activity, however Club is under no obligation to remunerate Player for said appearances or activities. Such appearances and activities shall be scheduled by Club in a reasonable manner. To the extent the Player incurs any out-of-pocket expenses, Club shall reimburse Player for such reasonable out-of-pocket expenses within thirty (30) days of submission of a written expense report and applicable receipts. Player grants to Club the rights to the use of digital images of Player in uniform on the Club's internet website and in any Club publication.

**13.    BUSINESS DEVELOPMENT:** During the term of this Contract, Club and Player agree to work and cooperate with one another in good faith with respect to all Club media and marketing activities and recognize it is in the best interest of the Player and Club for Player, where appropriate and whenever possible, to pursue commercial, promotional and media relationships with the Club's sponsors and media partners. Club and Player agree that Player will exhaust all reasonable efforts to establish relationships exclusively with Club's sponsors and media partners, and only if after attempting to do so, the Player is unable to enter into a commercially reasonable relationship, then Player has the right to establish a relationship with a non-Club affiliated entity. However, Player agrees that, prior to entering into a relationship with any non-Club affiliated entity, Club's sponsors and media partners will have a reasonable opportunity to match any compensation terms, which would unequivocally require the Player to establish the relationship with that Club sponsor or media partner. Player agrees to refrain from engaging in any marketing or media activity, other than through Club or with Club's written consent, that would reasonably infer the Club's sponsorship or endorsement of such activity, including without limitation, use of the Club's name, logo, mark, colors, uniform or any other symbol identifying the Club. Notwithstanding anything to the contrary, Player agrees that he will not, without prior written consent of the Club (which consent will not be unreasonably withheld), appear as a regularly scheduled guest or host of a radio or television production related to professional football for any local media other than a Club-sponsored radio or television network.

**14.    PERFORMANCE BONUSES:** In order to earn any of the individual or team incentives contained in this Contract, Player must be on the Club's Active, Inactive, Reserve/Injured or Physically Unable to Perform lists for each game of the seasons covered by this Contract, exclusive of any games after this Contract has been terminated by Club for skill reasons. To the extent that any bonus or salary escalator provided in the Contract is satisfied upon a statistical achievement or ranking, the prioritized order in which statistical sources shall control is as follows: (i) the Official National Football League Statistics as compiled and promulgated by the NFL; (ii) the final Club statistics as compiled by the Club's coaching staff; or (iii) the unofficial statistics of the Club as compiled and promulgated by the Club's Media Relations Department. Furthermore, to the extent that any bonus or salary escalator provided herein rely upon percentages or totals, for the purposes of mathematical clarification, the corresponding truncated integer shall apply and the rounding up of decimals shall not apply.

**15.    SALARY FORFEITURE:** Player shall be subject to forfeiture of Salary to the maximum extent permitted and as defined under Article 4, Section 9 of the NFL Collective Bargaining Agreement, dated August 4, 2011.

**16.    REPAYMENT AND OFFSET:** With the exception of any amounts subject to repayment under the forfeiture terms and provisions of Article 4, Section 9 of the NFL Collective Bargaining Agreement dated August 4, 2011, any amounts owed by Player to Club shall be subject to this Paragraph. Player hereby expressly authorizes Club, in its sole discretion, to deduct and set off, at any





time and from time to time, all or part of any amounts owed by Player to Club from any current or deferred wages, salaries, bonuses, and/or any other amounts owed to Player by Club.  It is further understood and agreed that Player's waiver of rights to certain unearned and/or unpaid amounts and Player's obligation to repay to the Club certain amounts pursuant to the Contract are express conditions of the Contract and, but for Player's agreement to such conditions, Club would not have executed the Contract. In the event that this Contract is assigned to another NFL club or Player subsequently is otherwise employed by any professional football organization, including Club, as a football player, Player hereby authorizes such club(s) to deduct for the account of Club the full amount of any such amounts owed by Player to Club that were not repaid to, or collected by, Club prior thereto.  Player hereby agrees, upon request of Club, to execute any further documentation required or otherwise deemed necessary to facilitate such repayment. If any outstanding amounts owed by Player to Club cannot be satisfied in full by the deductions described herein, then Club will be entitled to exercise all rights and remedies available to it to compel immediate payment thereof, and Player and Club agree that the non-prevailing party will pay all costs and expenses of such collection including, but not limited to, attorney's fees.

17.    **TAX IMPLICATIONS:**  Player and Player's representatives acknowledge and agree that neither Club nor any of its advisors or affiliates have any responsibility to provide Player, Player's representatives or any of Player's advisors or affiliates with tax advice related to the tax consequences of this NFL Player Contract or otherwise.  Player shall be responsible (and Club does not assume any responsibility) for paying all income, employment, excise and other taxes (including, but not limited to, any tax incurred pursuant to Section 409A of the Internal Revenue Code) on all payments, benefits, and other income (including imputed income) provided under, or resulting from, this Contract and any plan or other arrangement involving Club.

18.    **ACKNOWLEDGEMENT:** By executing this Addendum, Player acknowledges that Player has read the Contract and all associated addenda, Player has consulted with the advisor of Player's choice or had the opportunity to do so, and Player understands the terms and enters into the Contract of his own free will and choice.  This Contract is being executed in Renton, Washington.

| | |
|---|---|
| _Malik McDowell (signature)_ | _05/25/17_ |
| MALIK MCDOWELL | DATE |
| | |
| DREW ROSENHAUS | DATE |
| | |
| SEATTLE SEAHAWKS | |
| CLUB | |
| _Matthew H. Thomas (signature)_ | _5/25/17_ |
| MATTHEW H. THOMAS | DATE |

Page **9** of 10

time and from time to time, all or part of any amounts owed by Player to Club from any current or deferred wages, salaries, bonuses, and/or any other amounts owed to Player by Club. It is further understood and agreed that Player's waiver of rights to certain unearned and/or unpaid amounts and Player's obligation to repay to the Club certain amounts pursuant to the Contract are express conditions of the Contract and, but for Player's agreement to such conditions, Club would not have executed the Contract. In the event that this Contract is assigned to another NFL club or Player subsequently is otherwise employed by any professional football organization, including Club, as a football player, Player hereby authorizes such club(s) to deduct for the account of Club the full amount of any such amounts owed by Player to Club that were not repaid to, or collected by, Club prior thereto. Player hereby agrees, upon request of Club, to execute any further documentation required or otherwise deemed necessary to facilitate such repayment. If any outstanding amounts owed by Player to Club cannot be satisfied in full by the deductions described herein, then Club will be entitled to exercise all rights and remedies available to it to compel immediate payment thereof, and Player and Club agree that the non-prevailing party will pay all costs and expenses of such collection including, but not limited to, attorney's fees.

17. **TAX IMPLICATIONS:** Player and Player's representatives acknowledge and agree that neither Club nor any of its advisors or affiliates have any responsibility to provide Player, Player's representatives or any of Player's advisors or affiliates with tax advice related to the tax consequences of this NFL Player Contract or otherwise. Player shall be responsible (and Club does not assume any responsibility) for paying all income, employment, excise and other taxes (including, but not limited to, any tax incurred pursuant to Section 409A of the Internal Revenue Code) on all payments, benefits, and other income (including imputed income) provided under, or resulting from, this Contract and any plan or other arrangement involving Club.

18. **ACKNOWLEDGEMENT:** By executing this Addendum, Player acknowledges that Player has read the Contract and all associated addenda, Player has consulted with the advisor of Player's choice or had the opportunity to do so, and Player understands the terms and enters into the Contract of his own free will and choice. This Contract is being executed in Renton, Washington.

| | |
|---|---|
| MALIK MCDOWELL | DATE |
| DREW ROSENHAUS | DATE 5/25/2017 |
| SEATTLE SEAHAWKS CLUB | |
| MATTHEW H. THOMAS | DATE |

**SIGNING BONUS ADDENDUM**
**TO THE NFL PLAYER CONTRACT BETWEEN**
**SEATTLE SEAHAWKS ("CLUB") AND MALIK MCDOWELL ("PLAYER")**
**FOR THE CONTRACT YEARS 2017, 2018, 2019 and 2020**

Player and Club are executing this Addendum concurrently with their execution of an NFL Player Contract for the **2017, 2018, 2019 and 2020** contract years (the "Contract"). As additional consideration and subject to the Player passing the Club's physical examination and approval of the Contract by the NFL Management Council, Club agrees to pay Player the sum of **$3,198,476** ("Signing Bonus"). Payment of said Signing Bonus shall be contingent upon the receipt of this Addendum and shall be payable as follows:

| PAYMENT DATE | AMOUNT OF PAYMENT |
|---|---|
| On or before June 2, 2017 | $1,598,476 |
| On or before July 14, 2017 | $800,000 |
| On or before September 15, 2017 | $500,000 |
| On or before October 16, 2017 | $300,000 |

Player shall be subject to forfeiture of Signing Bonus or Salary to the maximum extent permitted under Article 4, Section 9 of the NFL Collective Bargaining Agreement dated August 4, 2011. It is further understood and agreed that Player's waiver of rights to certain forfeited Signing Bonus amounts and Player's obligation to re-pay certain forfeited Signing Bonus amounts are express provisions of this Contract and, but for the provisions herein contained, Club would not have executed the Contract. Player hereby expressly authorizes Club, in its sole discretion, to deduct and set off at any time and from time to time all or any part of any sums of forfeited Signing Bonus owed by Player to Club from any current or deferred wages, salaries, contractual bonuses, performance based pay, termination pay, severance pay, injury protection benefit and/or additional consideration owed to Player by Club. Recovery of any forfeited amounts will be made in accordance with any applicable provisions of Article 4, Section 9 of the NFL Collective Bargaining Agreement dated August 4, 2011.

It is expressly understood that no part of the Signing Bonus herein provided is part of any salary in the Contract specified above and that said Signing Bonus will not be deemed part of any salary in the Contract specified above if Club exercises any option for Player's services in a season subsequent to the final contract year, and that such obligations of Club are not terminable if the Contract is terminated for skill via the NFL waiver system, provided that Player has not breached the terms of, the Contract or this Addendum prior to such termination.

To the extent any of the terms set forth above are deemed unenforceable under the NFL Collective Bargaining Agreement dated August 4, 2011, such unenforceable terms shall be reduced to the extent necessary so that the terms, as so reduced, are enforceable, while all other terms and conditions of the Contract shall remain in full force and effect. No term or condition of this Addendum, and no breach thereof, shall be waived, altered or modified except by written instrument.

_____      05/25/17
MALIK MCDOWELL                        DATE

_____      _____
DREW ROSENHAUS                        DATE

SEATTLE SEAHAWKS
_____
CLUB

_____      5/25/17
MATTHEW H. THOMAS                     DATE

Page **10** of 10

**SIGNING BONUS ADDENDUM**
**TO THE NFL PLAYER CONTRACT BETWEEN**
**SEATTLE SEAHAWKS ("CLUB") AND MALIK MCDOWELL ("PLAYER")**
**FOR THE CONTRACT YEARS 2017, 2018, 2019 and 2020**

Player and Club are executing this Addendum concurrently with their execution of an NFL Player Contract for the **2017, 2018, 2019 and 2020** contract years (the "Contract"). As additional consideration and subject to the Player passing the Club's physical examination and approval of the Contract by the NFL Management Council, Club agrees to pay Player the sum of **$3,198,476** ("Signing Bonus"). Payment of said Signing Bonus shall be contingent upon the receipt of this Addendum and shall be payable as follows:

| PAYMENT DATE | AMOUNT OF PAYMENT |
|---|---|
| On or before June 2, 2017 | $1,598,476 |
| On or before July 14, 2017 | $800,000 |
| On or before September 15, 2017 | $500,000 |
| On or before October 16, 2017 | $300,000 |

Player shall be subject to forfeiture of Signing Bonus or Salary to the maximum extent permitted under Article 4, Section 9 of the NFL Collective Bargaining Agreement dated August 4, 2011. It is further understood and agreed that Player's waiver of rights to certain forfeited Signing Bonus amounts and Player's obligation to re-pay certain forfeited Signing Bonus amounts are express provisions of this Contract and, but for the provisions herein contained, Club would not have executed the Contract. Player hereby expressly authorizes Club, in its sole discretion, to deduct and set off at any time and from time to time all or any part of any sums of forfeited Signing Bonus owed by Player to Club from any current or deferred wages, salaries, contractual bonuses, performance based pay, termination pay, severance pay, injury protection benefit and/or additional consideration owed to Player by Club. Recovery of any forfeited amounts will be made in accordance with any applicable provisions of Article 4, Section 9 of the NFL Collective Bargaining Agreement dated August 4, 2011.

It is expressly understood that no part of the Signing Bonus herein provided is part of any salary in the Contract specified above and that said Signing Bonus will not be deemed part of any salary in the Contract specified above if Club exercises any option for Player's services in a season subsequent to the final contract year, and that such obligations of Club are not terminable if the Contract is terminated for skill via the NFL waiver system, provided that Player has not breached the terms of, the Contract or this Addendum prior to such termination.

To the extent any of the terms set forth above are deemed unenforceable under the NFL Collective Bargaining Agreement dated August 4, 2011, such unenforceable terms shall be reduced to the extent necessary so that the terms, as so reduced, are enforceable, while all other terms and conditions of the Contract shall remain in full force and effect. No term or condition of this Addendum, and no breach thereof, shall be waived, altered or modified except by written instrument.

MALIK MCDOWELL _____     DATE _____

DREW ROSENHAUS _____     DATE _____ 5/25/2017 _____

SEATTLE SEAHAWKS _____
CLUB

MATTHEW H. THOMAS _____     DATE _____

Page **10** of **10**

# Exhibit C – NFL CBA Excerpts



**COLLECTIVE
BARGAINING
AGREEMENT**

August 4, 2011



# NFL PLAYERS
## A S S O C I A T I O N

# ARTICLE 4
## NFL PLAYER CONTRACT

**Section 1. Form:** The NFL Player Contract form attached hereto as Appendix A will be used for all player signings. This form cannot be amended without the approval of the NFL and the NFLPA.

**Section 2. Term:** The NFL Player Contract shall expire on the last day of the last League Year subject to such Contract.

**Section 3. Changes:**

    (a)    Notwithstanding Section 1 above, changes may be agreed to between a Club and a player in a player's contract consistent with the provisions of this Agreement.

    (b)    The NFL Player Contract shall provide that the player waives and releases: (i) any claims relating to the 2011 lockout; (ii) any antitrust claims relating to the Draft, restrictions on free agency, franchise player designations, transition player designations, the Entering Player Pool, or any other term or condition of employment relating to conduct engaged in prior to the date of this Agreement; and (iii) any claims relating to conduct engaged in pursuant to any collective bargaining agreement during the express term of such agreement.

**Section 4. Conformity:**

    (a)    All Player Contracts signed prior to the execution of this Agreement and in effect during the term of this Agreement shall be deemed amended in such a manner to require the parties to comply with the mandatory terms of this Agreement.

    (b)    Any reference in a Preexisting Contract or a Contract executed between July 25, 2011 and the effective date of this Agreement to a player being on the Club's 45-man roster shall be deemed amended to refer to the Club's 46-man roster.

    (c)    Any reference in a Preexisting Contract or a Contract executed between July 25, 2011 and the effective date of this Agreement to a player participating in a certain number of days of a Club's offseason workout program shall be deemed amended to refer to an equivalent number taking into account the maximum number of workouts in such a program under this Agreement as compared to the maximum number under the Prior Agreement (e.g., if a Preexisting Contract referred to a player participating in at least 40 workouts in an offseason program, it will be deemed amended to require participation in 26 workouts (40 out of a maximum of 56 workouts under the Prior Agreement is equivalent to 26 out of a maximum of 36 workouts in this Agreement).

    (d)    The parties reserve their rights with respect to the validity of forfeiture provisions in Preexisting Contracts.

    (e)    Any Player Contract signed after July 25, 2011 that uses the form from Appendix C of the Prior Agreement shall be deemed amended to use the form from Appendix A of this Agreement.

    (f)    The provisions of Paragraph 4 of the NFL Player Contract (as set forth in Appendix A of this Agreement) shall be deemed to be a part of any Player Contract in effect during the term of this Agreement.

(g)     Any reference in a Player Contract signed after July 25, 2011 to "the Agreement" or to the Settlement Agreement shall be deemed amended to refer to the applicable provision of this Agreement.

**Section 5.** Notices, Prohibitions, etc.:

(a)     Any agreement between any player and any Club concerning terms and conditions of employment shall be set forth in writing in a Player Contract as soon as practicable. Each Club shall provide to the NFL a copy of each such Player Contract within two days of the execution of such contract by the player and the Club. The NFL shall provide to the NFLPA a copy of each executed Player Contract it receives from a Club within two business days of its receipt of such Player Contract. It is anticipated that each Club will send a copy of each such Player Contract to the NFL by overnight mail the day it is so executed, and the NFL will send a copy of such copy to the NFLPA by overnight mail the day it is so received. The NFL shall provide to the NFLPA any salary information received from a Club which is relevant to whether such Player Contract complies with Article 7 and/or Article 13, within two business days following the NFL's receipt of such information. Promptly upon but no later than two business days after the signing of any Veteran with less than three Accrued Seasons to a Player Contract, the signing Club shall notify the NFL, which shall notify the NFLPA of such signing.

(b)     Any agreement between any player or Player Affiliate and any Club or Club Affiliate providing for the player to be compensated by the Club or Club Affiliate for nonfootball-related services shall be set forth in writing as a separate addendum to the player's Player Contract, which addendum shall state the amount of or otherwise describe such consideration. If such an agreement is executed subsequent to the execution of the player's NFL Player Contract, it must be submitted to the NFL as an addendum to that Player Contract within two days of the execution or making of the agreement. The NFL shall provide a copy of such addendum to the NFLPA within two business days of receipt.

(c)     No Club shall pay or be obligated to pay any money or anything else of value to any player or Player Affiliate (not including retired players) other than pursuant to the terms of a signed NFL Player Contract (or any addendum thereto for nonfootball-related services as described in Subsection 5(b) above). Nothing contained in the immediately preceding sentence shall interfere with a Club's obligation to pay a player deferred compensation earned under a prior Player Contract.

(d)     In addition to any rights a Club may presently have under the NFL Player Contract, any Player Contract may be terminated if, in the Club's opinion, the player being terminated is anticipated to make less of a contribution to the Club's ability to compete on the playing field than another player or players whom the Club intends to sign or attempt to sign, or another player or players who is or are already on the roster of such Club, and for whom the Club needs Room. This Subsection shall not affect any Club or Club Affiliate's obligation to pay a player any guaranteed consideration.

(e)     No Player Contract may contain any individually-negotiated term transferring any player intellectual property rights to any Club or Club Affiliate or any Club sponsor.

10

(f)     No Club or player may agree upon any Player Contract provision concerning the termination of the contract that is inconsistent with the terms of this Agreement (including but not limited to the NFL Player Contract, Appendix A hereto), or the provisions of the NFL Constitution and Bylaws as set forth in the attachment to the letter dated August 4, 2011.

***Section 6.* Commissioner Disapproval:**
(a)     If the Commissioner disapproves a Player Contract for any reason, he must inform the NFLPA in writing of the reasons therefore by noon on the date following such disapproval.

(b)     In the event the Commissioner disapproves any Player Contract as being in violation of this Article, Article 7, Article 13, or any other provision of the this Agreement, the filing of an appeal of such disapproval pursuant to Article 14, Section 5 or Article 15, Section 1 of this Agreement, shall automatically stay the Commissioner's disapproval, and the player shall continue to be free to practice and play for the Club, until the System Arbitrator issues his or her ruling. Provided, however, that in the event such appeal is filed within one week of or after the first scheduled regular season game of the Club: (i) the appeal shall be conducted in an expedited manner and shall be concluded within five days of the filing date of such appeal; and (ii) the System Arbitrator shall issue his or her ruling by the end of such five day period. Provided, further, that, in the event the appeal is filed after the Club's first preseason game, but before the date one week before the Club's first scheduled regular season game: (i) the appeal shall be conducted in an expedited manner and shall be concluded within ten days of the filing date of such appeal; and (ii) the System Arbitrator shall issue his or her ruling by the end of such ten day period. If there is no ruling by the end of the periods prescribed in the preceding two sentences, or, for earlier filed appeals, by the day following the Club's third preseason game, the automatic stay shall be dissolved. If the Commissioner disapproves a Player Contract for any of the reasons stated above on a second occasion for the same player during a given League Year, and determines that such player should not be able to play, there shall be no stay of such disapproval pursuant to this Agreement, unless it is determined that the Commissioner's second disapproval is arbitrary or capricious.

***Section 7.* NFLPA Group Licensing Program:** The NFL Player Contract shall include, solely for the administrative convenience and benefit of the player and the NFLPA, the provision set forth in Paragraph 4(b) of the NFL Player Contract (Appendix A hereto), regarding the NFLPA Group Licensing Program. Neither the League nor any Club is a party to, or a beneficiary of, the terms of that provision. No Club may enter into any agreement with a Player or a Player Affiliate that is inconsistent with any rights granted to the NFLPA pursuant to Paragraph 4(b) of the NFL Player Contract; provided that this sentence is not intended and shall not be construed to override or restrict the rights granted to the Club and the League pursuant to Paragraph 4(a) of the NFL Player Contract.

*Section 8.* **Good Faith Negotiation:**

    (a)    In addition to complying with specific provisions in this Agreement, any Club, any player, and any player agent or contract advisor engaged in negotiations for a Player Contract (including any Club extending, and any player receiving, a Required Tender) is under an obligation to negotiate in good faith.

    (b)    A Club extending a Required Tender must, for so long as that Tender is extended, have a good faith intention to employ the player receiving the Tender at the Tender compensation level during the upcoming season. It shall be deemed to be a violation of this provision if, while the tender is outstanding, a Club insists that such a player agree to a Player Contract at a compensation level during the upcoming season below that of the Required Tender amount. The foregoing shall not affect any rights that a Club may have under the Player Contract or this Agreement, including but not limited to the right to terminate the contract, renegotiate the contract, or to trade the player if such termination, renegotiation, or trade is otherwise permitted by the Player Contract or this Agreement.

*Section 9.* **Forfeiture of Salary:** Players and Clubs may not agree upon contract provisions that authorize the Club to obtain a forfeiture of any Salary from a player except to the extent and in the circumstances provided in this Section 9. For the avoidance of doubt, Paragraph 5 Salary already earned may never be forfeited, and other Salary already earned may never be forfeited except as expressly provided herein. The maximum permitted forfeitures described below do not in any way obligate any player or Club to agree to any forfeiture.

    (a)    **Forfeitable Breach.** Any player who (i) willfully fails to report, practice or play with the result that the player's ability to fully participate and contribute to the team is substantially undermined (for example, without limitation, holding out or leaving the squad absent a showing of extreme personal hardship); or (ii) is unavailable to the team due to conduct by him that results in his incarceration; or (iii) is unavailable to the team due to a nonfootball injury that resulted from a material breach of Paragraph 3 of his NFL Player Contract; or (iv) voluntarily retires (collectively, any "Forfeitable Breach") may be required to forfeit signing bonus, roster bonus, option bonus and/or reporting bonus, and no other Salary, for each League Year in which a Forfeitable Breach occurs (collectively, "Forfeitable Salary Allocations"), as set forth below:

    (i)    **Training Camp.** If a player commits a Forfeitable Breach resulting in his absence for six preseason days after the start of training camp, the player may be required to forfeit up to 15% of his Forfeitable Salary Allocations, and up to an additional 1% of his Forfeitable Salary Allocations for each additional preseason day missed after the six days, up to a maximum of 25% of his Forfeitable Salary Allocations. A player who misses five days or less of training camp may not be subject to forfeiture.

    (ii)    **Continuing Violation.** If a player commits a Forfeitable Breach resulting in his absence from training camp and such absence continues into the regular season, in addition to the maximum forfeiture permitted by Subsection (i) above, the player may be required to forfeit an additional 25% of the remaining Forfeitable Salary Allocations upon missing the first regular season game. If such absence continues beyond the fourth week of the regular season, the player may be required to forfeit up to

12

his remaining Forfeitable Salary Allocations on a proportionate weekly basis (i.e., one-seventeenth for each missed regular season week after the fourth week).

    (iii)   **Regular Season.** If the player is not subject to Subsection (ii) above, and commits a Forfeitable Breach for the first time that League Year during the regular season, the player may be required to forfeit up to twenty-five percent (25%) of his Forfeitable Salary Allocations upon missing his first regular season game. If player's Forfeitable Breach continues beyond four (4) consecutive weeks, then player may be required to forfeit up to his remaining Forfeitable Salary Allocations on a proportionate weekly basis (i.e., one-seventeenth for each missed regular season week after the fourth week).

    (iv)   **Postseason.** For the period following the Club's last regular season game through the Club's last postseason game, a player who commits a Forfeitable Breach during such period may be required to forfeit up to 25% of his Forfeitable Salary Allocations for that League Year, subject to Subsection (d) below.

    (v)   **Second Forfeitable Breach.** If the player commits an initial Forfeitable Breach (including a Forfeitable Breach in training camp) and then commits a second Forfeitable Breach during the regular season or postseason in the same League Year, the player may be required to forfeit immediately the entirety of his remaining Forfeitable Salary Allocations for that League Year.

    (vi)   **Retirement.** Should a Forfeitable Breach occur due to player's retirement, a Club may demand repayment of all Forfeitable Salary Allocations attributable to the proportionate amount, if any, for the present year and the Forfeitable Salary Allocations for future years. If the player fails to repay such amounts, then the Club may seek an award from the System Arbitrator pursuant to Article 15, for repayment of all Forfeitable Salary Allocations attributable to present and future years. Repayment of Forfeitable Salary Allocations attributable to future League Years must be made by June 1st of each League Year for which each Forfeitable Salary Allocation is attributable. If the player returns to play for the Club in the subsequent season, then the Club must either (a) take the player back under his existing contract with no forfeiture of the remaining Forfeitable Salary Allocations, or (b) release the player and seek repayment of any remaining Forfeitable Salary Allocations for future League Years.

    (b)   **Forfeitable Salary Allocations.** For the purposes of this Section, the term "Forfeitable Salary Allocations" means: (i) for signing bonus, the Salary Cap allocation for the player's signing bonus for that League Year; and (ii) for roster, option and reporting bonuses that are earned in the same League Year as the Forfeitable Breach, the allocation of such bonus for that League Year, out of the total amount of such bonus as allocated over that League Year and any remaining League Years in the player's contract, notwithstanding the Salary Cap treatment of such bonuses. For example, without limitation, if a player has a $1 million roster bonus that is earned in the same year the player committed a Forfeitable Breach, then, regardless of when that roster bonus is to be paid, that bonus is attributable to the same year as the Forfeitable Breach; if the player has that year and one additional year remaining on his contract, then $500,000 of the roster bonus will be allocated to each of those years for purposes of any potential forfeiture calculation. If the Forfeitable Breach occurs in the second League Year in this example

(i.e., the League Year after the roster bonus in this example is earned), there shall be no forfeiture of any portion of such roster bonus.

    (c)    **Proportionate Forfeiture.** For purposes of this Section, a "proportionate" amount means one-seventeenth of the Forfeitable Salary Allocations for that League Year for each regular season week missed.

    (d)    **Maximum Forfeitable Salary.** Under this Section, and without limitation, under no circumstances may a player be required to forfeit more than 100% of his Forfeitable Salary Allocations for each League Year in which he commits a Forfeitable Breach. With respect to roster bonus, option bonus and reporting bonus, a forfeiture may only occur if the Forfeitable Breach occurs in the same League Year in which the bonus is scheduled to be earned.

    (e)    **Drug or Steroid Policy Violations.** Player Contracts may not contain individually negotiated provisions for forfeiture relating to violations of the Policy on Anabolic Steroids and Related Substances or the NFL Policy and Program on Substances of Abuse, or for failing any drug test. A player suspended by the League pursuant to either of those policies for a period encompassing regular season or postseason games shall be required to forfeit any Forfeitable Salary Allocations on a proportionate weekly basis.

    (f)    **Offseason.** Salary may not be subject to forfeiture for missing voluntary offseason programs or voluntary minicamps, provided that the Club may have non-proratable participation bonuses for its offseason workout program.

    (g)    **Voiding of Guarantees.** Notwithstanding any other provision of this Section 9, a Club and player may negotiate the circumstances under which the guarantee of any unearned Salary (including, without limitation, Paragraph 5 Salary and/or future year roster bonuses, option bonuses or reporting bonuses) may be voided. This Subsection (g) only applies to the guarantee aspect of the contract provision, and not to the amount that can be earned, and in no way expands the permissible scope of Forfeitable Salary under this Section.

    (h)    **Deduction/Payment.** Recovery of any forfeiture under this Section may be made from any payments owed to a player under any NFL Player Contract with the Club claiming the forfeiture, from any salary, bonus installments, Performance-Based Pay, Postseason Pay, Severance Pay or Termination Pay otherwise owed by the claiming Club. If the player challenges such recovery by filing a proceeding before the System Arbitrator, the Club shall be required to put the disputed sums in escrow pending receipt of a final award. The assignment and/or termination of a player's contract after events triggering the forfeiture shall not result in any waiver of the assigning or terminating Club's right to seek to recover the full amount of any forfeiture.

    (i)    **2006 CBA.** This Section is intended to supersede Section 9 of Article XIV of the Prior Agreement, and to overrule the decision in the proceeding under that Prior Agreement involving Plaxico Burress to the extent that the provisions in this Section 9 alter that decision with respect to Player Contracts entered into on or after July 25, 2011.

    (j)    **Dispute Resolution.** Any disputes regarding this Section, including any dispute regarding a player's failure to repay Salary pursuant to this Section, shall be resolved exclusively by the System Arbitrator under the provisions of Article 15.

(k)     **Club Discretion.** Except as provided in Subsection (e), any attempt to seek or collect a forfeiture from a player shall be solely in the Club's discretion, and any failure by a Club to seek a forfeiture from a player under this Section shall not be deemed a violation of any provision of this Agreement.

(l)     **Contract Provision.** It shall be permissible for a player and Club to agree in a Player Contract as follows: "Player shall be subject to forfeiture of Salary to the maximum extent permitted under Article 4, Section 9 of the Agreement dated July 25, 2011 [or "of the Collective Bargaining Agreement dated August 4, 2011]." A player is not in any way obligated to agree to any such forfeiture clause, or any lesser forfeiture permitted by this Section.

*Section 10.* **Return of Advanced Paragraph 5 Salary:** A player and Club may agree to the circumstances in which a player shall have to return any advanced Paragraph 5 Salary, so long as such agreement does not affect the player's ability to eventually earn such Paragraph 5 Salary by performing his services for the regular season week(s) in question. Nothing in this Section shall be construed to address the circumstances in which players are or are not entitled to Paragraph 5 Salary for such week(s).

## ARTICLE 15
## SYSTEM ARBITRATOR

*Section 1.* **Appointment:** The parties agree that the System Arbitrator shall have exclusive jurisdiction to enforce the terms of Articles 1, 4, 6–19, 26–28, 31, or 68–70 of this Agreement (except as provided in those Articles with respect to disputes determined by the Impartial Arbitrator, the Accountants, or another arbitrator).

*Section 2.* **Scope of Authority:**

(a)   The System Arbitrator shall make findings of fact and determinations of relief including, without limitation, damages (including damages referred to in Article 17, Section 9), injunctive relief, fines, and specific performance.

(b)   The Appeals Panel shall accept the System Arbitrator's findings of fact unless clearly erroneous and the System Arbitrator's recommendations of relief unless based upon clearly erroneous findings of fact, incorrect application of the law, or abuse of discretion, except that, as to any finding concerning Article 17, any imposition of a fine of $1 million or more, or any finding that would permit termination of this Agreement, review shall be de novo.

(c)   Subject to Subsections (a) and (b) above, the Appeals Panel shall determine all points of law and finally make the award of all relief including, without limitation, contract damages, injunctive relief, fines, and specific performance.

(d)   Except for any matters for which the Appeals Panel has de novo review of the System Arbitrator's determinations, rulings of the System Arbitrator shall upon their issuance be binding upon and followed by the parties unless stayed, reversed, or modified by the Appeals Panel. In entertaining a request for a stay of a ruling of the System Arbitrator, the Appeals Panel shall apply the standard that the United States Court of Appeals for the Second Circuit would apply to a request for a stay of a ruling of a district court within that Circuit. If and when a decision of the System Arbitrator is reversed or modified, the effect of such reversal or modification shall be deemed by the parties to be retroactive to the time of issuance of the ruling of the System Arbitrator.

(e)   The System Arbitrator's and Appeals Panel's authority shall be limited to the terms of 1, 4, 6–19, 26–28, 31, or 68–70 of this Agreement (except as provided in those Articles with respect to disputes determined by the Impartial Arbitrator, the Accountants, or another arbitrator).

(f)   **Statute of Limitations.** Unless otherwise specified in this Agreement, a three year statute of limitations shall apply to the initiation of proceedings before the System Arbitrator, which statute begins to apply on the date upon which the facts giving rise to the proceeding are known or reasonably should have been known to the party bringing the proceeding.

*Section 3.* **Discovery:** In any of the disputes described in this Agreement over which the System Arbitrator has authority, the System Arbitrator shall grant reasonable and expedited discovery upon the application of any party where, and to the extent, he determines it is reasonable to do so. Such discovery may include the production of documents and the taking of depositions. Subject to rules to be agreed to by the parties,

in any proceeding to review any alleged violation of Article 12 of this Agreement regarding any AR issue, the System Arbitrator shall have the authority, upon good cause shown, to direct any Club to produce any tax materials disclosing any income figures for such Club or Club Affiliate (non-income figures may be redacted) which in his or her judgment relates to any such alleged violation, including but not limited to portions of any tax returns or other documents submitted to the Internal Revenue Service. Subject to rules to be agreed to by the parties, in any proceeding to review any alleged violation of Article 13 and/or Article 7 of this Agreement regarding any Salary paid to any player(s), the System Arbitrator shall have the authority, upon good cause shown, to direct any such player(s) to produce any tax materials disclosing any income figures for any such player or Player Affiliate (non-income figures may be redacted) which in his or her judgment relates to any such alleged violation, including but not limited to portions of any tax returns or other documents submitted to the Internal Revenue Service. In each case the System Arbitrator shall not release such tax materials to the general public, and any such tax materials shall be treated as strictly confidential under an appropriate protective order.

*Section 4.* **Compensation:** The compensation and costs of retaining the System Arbitrator and the Appeals Panel shall be equally borne by the NFL and the NFLPA. In no event shall any party be liable for the attorneys' fees incurred in any such enforcement proceeding by any other party, except as set forth in Article 17.

*Section 5.* **Procedures:** All matters in enforcement proceedings before the System Arbitrator shall be heard and determined in an expedited manner. An enforcement proceeding may be commenced upon 72 hours written notice (or upon shorter notice if ordered by the System Arbitrator) served upon the party against whom the enforcement proceeding is brought and filed with the System Arbitrator. All such notices and all orders and notices issued and directed by the System Arbitrator shall be served upon the NFL and the NFLPA, in addition to any counsel appearing for individual NFL players or individual NFL Clubs. The NFL and the NFLPA shall have the right to participate in all such enforcement proceedings, and the NFLPA may appear in any enforcement proceedings on behalf of any NFL player who has given authority for such appearance. Unless otherwise agreed, all hearings will be transcribed.

*Section 6.* **Selection of System Arbitrator:**
    (a)    In the event that the NFL and NFLPA cannot agree on the identity of a System Arbitrator, the parties agree to ask the CPR Institute (or such other organization(s) as the parties may agree) for a list of eleven attorneys (none of whom shall have nor whose firm shall have represented within the past five years players, player representatives, clubs or owners in any professional sport). If the parties cannot within thirty days of receipt of such list agree to the identity of the System Arbitrator from among the names on such list, they shall alternately strike names from said list, until only three names remain, at which point the parties shall make reasonable efforts to interview the remaining candidates. After those interviews, and if the parties cannot agree on the selection, the striking process shall resume until only one name remains, and that person shall

114

be the System Arbitrator. The first strike shall be determined by a coin flip. Upon selection, the System Arbitrator shall serve for an initial eighteen-month term commencing on the date of entry of the order of appointment. Thereafter, the System Arbitrator shall continue to serve for successive two-year terms unless notice to the contrary is given either by the NFL or the NFLPA. Such notice shall be given to the other party and the System Arbitrator within the ninety days preceding the end of any term, but no later than thirty days prior to the end of such term. Following the giving of such notice, a new System Arbitrator shall be selected in accordance with the procedures set forth in this Section 6. The NFL and the NFLPA may dismiss the System Arbitrator at any time and for any reason upon their mutual consent. Unless the parties otherwise agree, a discharged System Arbitrator shall retain jurisdiction for any proceeding which has been commenced prior to such discharge.

    (b)    In the event of the absence (or vacancy) of the System Arbitrator, one of the members of the Appeals Panel (to be chosen by the parties, confidentially using the strike system) shall serve as the System Arbitrator until a new System Arbitrator is chosen pursuant to Subsection (a) above.

*Section 7*. **Selection of Appeals Panel:**

    (a)    There shall be a three-member Appeals Panel, at least one of whom must be a former judge. In the event the NFL and NFLPA cannot agree upon the members of such a panel, the parties will jointly ask the CPR Institute (or such other organization(s) as the parties may agree) to submit to the parties a list of fifteen (15) attorneys (none of whom shall have, nor whose firm shall have, represented within the past five (5) years any professional athletes; agents or other representatives of professional athletes; labor organizations representing athletes; sports leagues, governing bodies, or their affiliates; sports teams or their affiliates; or owners in any professional sport). If the parties cannot within fifteen (15) days from the receipt of such list agree to the identity of the Appeals Panel from among the names on such list, they shall meet and alternate striking one (1) name at a time from the list until three (3) names on the list remain. The first strike will be assigned to the party that received the second strike in the selection of the System Arbitrator, or a coin flip, if striking was not used in selecting the System Arbitrator. The three (3) remaining names on the list shall comprise the Appeals Panel. The compensation of the members of the Appeals Panel and the costs of proceedings before the Appeals Panel shall be borne equally by the parties to this Agreement; provided, however, that each participant in an Appeals Panel proceeding shall bear its own attorneys' fees and litigation costs.

    (b)    In the event that there is a vacancy on the Appeals Panel, or in the event that an appeal is taken from a decision of a member of the Appeals Panel serving as the System Arbitrator pursuant to Subsection 6(b) above, the parties shall select another member to the Panel, using the procedures set forth in Subsection 7(a) above.

***Section 8.*** **Procedure for Appeals:**

    (a)    Any party seeking to appeal (in whole or in part) an award of the System Arbitrator must serve on the other party and file with the System Arbitrator a notice of appeal within ten (10) days of the date of the award appealed from.

    (b)    Following the timely service and filing of a notice of appeal, the NFLPA and NFL shall attempt to agree upon a briefing schedule. In the absence of such agreement, and subject to Subsection (d) below, the briefing schedule shall be set by the Appeals Panel; provided, however, that any party seeking to appeal (in whole or in part) from an award of the System Arbitrator shall be afforded no less than fifteen (15) and no more than twenty-five (25) days from the date of the issuance of such award, or the date of the issuance of the System Arbitrator's written opinion, whichever is latest, to serve on the opposing party and file with the Appeals Panel its brief in support thereof; and provided further that the responding party or parties shall be afforded the same aggregate amount of time to serve and file its or their responding brief(s).

    (c)    The Appeals Panel shall schedule oral argument on the appeal(s) no less than five (5) and no more than ten (10) days following the service and filing of the responding brief(s), and shall issue a written decision within thirty (30) days from the date of argument. The Appeals Panel shall have the discretion to permit a reply brief.

    (d)    For good cause, either party may seek to accelerate the briefing, hearing, and decision schedule set forth in Subsections (b) and (c) above.

    (e)    The decision of the Appeals Panel shall constitute full, final, and complete disposition of the dispute. If there is no timely appeal of a decision of the System Arbitrator, the System Arbitrator's decision shall constitute the full, final and complete disposition of the dispute.

***Section 9.*** **Decision:** Any decision issued by the System Arbitrator or the Appeals Panel may be enforced only against a Club or Clubs or the League, as applicable, found to have violated this Agreement. In no event may the System Arbitrator or Appeals Panel order relief, or assess any monetary award, against an individual Club owner, officer, or non-player employee.

***Section 10.*** **Confidentiality:** Unless the parties agree otherwise, proceedings before the System Arbitrator and Appeals Panel, other than their decisions, shall be confidential, and may not be disclosed to persons other than counsel, senior executives of the NFL and any involved Club, senior executives of the NFLPA, the NFLPA Executive Committee, NFLPA Player Representatives, and any involved player(s), player agent(s), or Club or League personnel. The foregoing does not prejudice the right of any party to seek any additional confidentiality restrictions (including as to the decision) from the System Arbitrator or Appeals Panel, if such party demonstrates just cause.

## APPENDIX A
## NFL PLAYER CONTRACT

THIS CONTRACT is between_____, hereinafter "Player," and _____, a _____corporation (limited partnership) (partnership), hereinafter "Club," operating under the name of the _____ as a member of the National Football League, hereinafter "League." In consideration of the promises made by each to the other, Player and Club agree as follows:

1. TERM. This contract covers _____ football season(s), and will begin on the date of execution or March 1, _____, whichever is later, and end on February 28 or 29, _____, unless extended, terminated, or renewed as specified elsewhere in this contract.

2. EMPLOYMENT AND SERVICES. Club employs Player as a skilled football player. Player accepts such employment. He agrees to give his best efforts and loyalty to the Club, and to conduct himself on and off the field with appropriate recognition of the fact that the success of professional football depends largely on public respect for and approval of those associated with the game. Player will report promptly for and participate fully in Club's official mandatory minicamp(s), official preseason training camp, all Club meetings and practice sessions, and all preseason, regular season and postseason football games scheduled for or by Club. If invited, Player will practice for and play in any all-star football game sponsored by the League. Player will not participate in any football game not sponsored by the League unless the game is first approved by the League.

3. OTHER ACTIVITIES. Without prior written consent of the Club, Player will not play football or engage in activities related to football otherwise than for Club or engage in any activity other than football which may involve a significant risk of personal injury. Player represents that he has special, exceptional and unique knowledge, skill, ability, and experience as a football player, the loss of which cannot be estimated with any certainty and cannot be fairly or adequately compensated by damages. Player therefore agrees that Club will have the right, in addition to any other right which Club may possess, to enjoin Player by appropriate proceedings from playing football or engaging in football-related activities other than for Club or from engaging in any activity other than football which may involve a significant risk of personal injury.

4. PUBLICITY AND NFLPA GROUP LICENSING PROGRAM.

    (a)    Player hereby grants to Club and the League, separately and together, the right and authority to use, and to authorize others to use solely as described below, his name, nickname, initials, likeness, image, picture, photograph, animation, persona, autograph/signature (including facsimiles thereof), voice, biographical information and/or any and all other identifying characteristics (collectively, "Publicity Rights"), for any and all uses or purposes that publicize and promote NFL Football, the League or any of its

member clubs in any way in any and all media or formats, whether analog, digital or other, now known or hereafter developed, including, but not limited to, print, tape, disc, computer file, radio, television, motion pictures, other audio-visual and audio works, Internet, broadband platforms, mobile platforms, applications, and other distribution platforms. Without limiting the foregoing, this grant includes the right to use Player's Publicity Rights for the purpose of publicizing and promoting the following aspects of NFL Football, the League and/or any of its member clubs: brands, games, ticket sales, game broadcasts and telecasts, programming focused on the NFL, one or more NFL clubs and/or their games and events (e.g., coaches shows, highlight based shows such as *Inside the NFL*, behind-the-scenes programming such as *Hard Knocks*), other NFL-related media offerings (e.g., branded content segments featuring NFL game footage and other programming enhancements), media distribution platforms (e.g., NFL.com, NFL Mobile, NFL Network), official events (e.g., NFL Kickoff, NFL Draft), officially sanctioned awards programs (e.g., Rookie of the Year), and public service or community oriented initiatives (e.g., Play60). For purposes of clarity, the foregoing grant of rights includes the right and authority to use, and to authorize affiliates or business partners to use, after the term of this Agreement any Publicity Rights fixed in a tangible medium (e.g., filmed, photographed, recorded or otherwise captured) during the term of this Agreement solely for the purposes described herein. Notwithstanding anything to the contrary, the foregoing grant does not confer, during or after the term of this Agreement, any right or authority to use Player's Publicity Rights in a manner that constitutes any endorsement by Player of a third-party brand, product or service ("Endorsement"). For purposes of clarity, and without limitation, it shall not be an Endorsement for Club or the League to use, or authorize others to use, including, without limitation, in third party advertising and promotional materials, footage and photographs of Player's participation in NFL games or other NFL events that does not unduly focus on, feature, or highlight, Player in a manner that leads the reasonable consumer to believe that Player is a spokesperson for, or promoter of, a third-party commercial product or service.

Player will cooperate with the news media, and will participate upon request in reasonable activities to promote the Club and the League.

Player and National Football League Players Association, including any of its affiliates ("NFLPA") do not and will not contest during or after the term of this agreement, and this hereby confirms their acknowledgment of, the exclusive rights of the League, Club and any NFL member club (i) to telecast, broadcast, or otherwise distribute, transmit or perform, on a live, delayed, or archived basis, in any and all media now known or hereafter developed, any NFL games or any excerpts thereof and (ii) to produce, license, offer for sale, sell, market, or otherwise distribute or perform (or authorize a third party to do any of the foregoing), on a live, delayed, or archived basis, any NFL games or any excerpts thereof, in any and all media now known or hereafter developed, including, but not limited to, packaged or other electronic or digital media.

Nothing herein shall be construed to grant any Publicity Rights for use in licensed consumer products, whether traditional or digital (e.g., video games, trading cards, apparel), other than such products that constitute programming (as described herein) or news and information offerings regardless of medium (e.g., DVDs, digital highlight offerings).

(b)     Player hereby assigns the NFLPA and its licensing affiliates, if any, the exclusive and unlimited right to use, license and sublicense the right to use his name, nickname, initials, autograph/signature (including facsimiles), voice, picture, photograph, animation, image, likeness, persona, jersey number, statistics, data, copyrights, biographical information and/or other personal indicia (individually and collectively, "Rights") for use in connection with any product, brand, service, appearance, product line or other commercial use and any sponsorship, endorsement or promotion thereof, when more than five (5) NFL player Rights are involved, regardless of team affiliation and whether that number is reached using player Rights simultaneously or individually, in any form, media, or medium (now known or hereafter developed) during a consecutive 12-month period (a "group licensing program"). For sponsorships, endorsements, and promotions, group licensing programs are further defined as those: (a) in any one product category, as defined by industry standards; or (b) in different categories if the products all use similar or derivative design or artwork, or one player product is used to promote another player product.

The Rights may also be used for the promotion of the NFLPA, its affiliated entities and/or its designees (the "NFLPA Entities"), provided such promotion does not constitute an endorsement by Player of a commercial product not a part of a group licensing program. Player agrees to participate, upon request of the NFLPA and without additional compensation, in reasonable activities to promote the NFLPA Entities, which shall include (i) up to three (3) personal appearances per year or (ii) up to fifteen (15) minutes per week dedicated to promoting the NFLPA Entities. Player retains the right to grant permission to others to utilize his Rights if that individual or entity is not concurrently utilizing the Rights of five (5) or more other NFL players for any commercial purpose whatsoever. If Player's inclusion in an NFLPA program is precluded by an individual exclusive endorsement agreement, and Player provides the NFLPA with immediate written notice of that preclusion, the NFLPA agrees to exclude Player from that particular program. Should Player fail to perform any of his obligations hereunder, the NFLPA may withhold payments owed to Player, if any, in connection with this Group Licensing Assignment.

In consideration for this assignment of rights, the NFLPA agrees to use the revenues it receives from group licensing programs to support the objectives as set forth in the Bylaws of the NFLPA and as otherwise determined by the NFLPA Board. The NFLPA further agrees to use reasonable efforts to promote the use of NFL player Rights in group licensing programs, to provide group licensing opportunities to all NFL players, and to monitor and police unauthorized third-party use of the Rights. The NFLPA makes no representations regarding group licensing other than those expressed herein. This agreement shall be construed under Virginia law.

The assignment in this paragraph shall expire on December 31 of the latter of (i) the third year following the execution of this contract, or (ii) the year after this contract expires, and may not be revoked, terminated or otherwise assigned in any manner by Player until such date. Neither Club nor the League is a party to the terms of this paragraph, which is included herein solely for the administrative convenience and benefit of Player and the NFLPA.

Nothing in Paragraph 4b shall be construed or deemed to modify in any way the rights set forth in Paragraph 4a, and the fact that Paragraph 4b (or any of the terms thereof) appears in the Player Contract shall not be referred to, relied upon, or otherwise cited by Player and/or the NFLPA or any of its affiliates in any dispute or legal proceeding as evidence that the NFL, any NFL entity, any Club or Club Affiliate, or any licensee of any of the foregoing has consented, agreed, acknowledged, or does not contest the applicability or interpretation of Paragraph 4b.

5. COMPENSATION. For performance of Player's services and all other promises of Player, Club will pay Player a yearly salary as follows:

| | | |
|---|---|---|
| $ | /* | for the 20_____season; |
| $ | /* | for the 20_____season; |
| $ | /* | for the 20_____season; |
| $ | /* | for the 20_____season; |
| $ | /* | for the 20_____season. |

(* - designates the compensation Club will pay player if the player is not on Club's Active/Inactive List)

In addition, Club will pay Player such earned performance bonuses as may be called for in this contract; Player's necessary traveling expenses from his residence to training camp; Player's reasonable board and lodging expenses during preseason training and in connection with playing preseason, regular season, and postseason football games outside Club's home city; Player's necessary traveling expenses to and from preseason, regular season, and postseason football games outside Club's home city; Player's necessary traveling expenses to his residence if this contract is terminated by Club; and such additional compensation, benefits and reimbursement of expenses as may be called for in any collective bargaining agreement in existence during the term of this contract. (For purposes of this contract, a collective bargaining agreement will be deemed to be "in existence" during its stated term or during any period for which the parties to that agreement agree to extend it.)

6. PAYMENT. Unless this contract or any collective bargaining agreement in existence during the term of this contract specifically provides otherwise, Player will be paid 100% of his yearly salary under this contract in equal weekly or biweekly installments over the course of the applicable regular season period, commencing with the first regular season game played by Club in each season. Unless this contract specifically provides otherwise, if this contract is executed or Player is activated after the beginning of the regular season, the yearly salary payable to Player will be reduced proportionately and Player will be paid the weekly or biweekly portions of his yearly salary becoming due and payable after he is activated. Unless this contract specifically provides otherwise, if this contract is terminated after the beginning of the regular season, the yearly salary payable to Player will be reduced proportionately and Player will be paid the weekly or bi weekly portions of his yearly salary having become due and payable up to the time of termination.

7. DEDUCTIONS. Any advance made to Player will be repaid to Club, and any properly levied Club fine or Commissioner fine against Player will be paid, in cash on demand or by means of deductions from payments coming due to the Player under this contract, the amount of such deductions to be determined by Club unless this contract or any collective bargaining agreement in existence during the term of this contract specifically provides otherwise.

8. PHYSICAL CONDITION. Player represents to Club that he is and will maintain himself in excellent physical condition. Player will undergo a complete physical examination by the Club physician upon Club request, during which physical examination Player agrees to make full and complete disclosure of any physical or mental condition known to him which might impair his performance under this contract and to respond fully and in good faith when questioned by the Club physician about such condition. If Player fails to establish or maintain his excellent physical condition to the satisfaction of the Club physician, or make the required full and complete disclosure and good faith responses to the Club physician, then Club may terminate this contract.

9. INJURY. Unless this contract specifically provides otherwise, if Player is injured in the performance of his services under this contract and promptly reports such injury to the Club physician or trainer, then Player will receive such medical and hospital care during the term of this contract as the Club physician may deem necessary, and will continue to receive his yearly salary for so long, during the season of injury only and for no subsequent period covered by this contract, as Player is physically unable to perform the services required of him by this contract because of such injury. If Player's injury in the performance of his services under this contract results in his death, the unpaid balance of his yearly salary for the season of injury will be paid to his stated beneficiary, or in the absence of a stated beneficiary, to his estate.

10. WORKERS' COMPENSATION. Any compensation paid to Player under this contract or under any collective bargaining agreement in existence during the term of this contract for a period during which he is entitled to workers' compensation benefits by reason of temporary total, permanent total, temporary partial, or permanent partial disability will be deemed an advance payment of workers' compensation benefits due Player, and Club will be entitled to be reimbursed the amount of such payment out of any award of workers' compensation.

11. SKILL, PERFORMANCE AND CONDUCT. Player understands that he is competing with other players for a position on Club's roster within the applicable player limits. If at any time, in the sole judgment of Club, Player's skill or performance has been unsatisfactory as compared with that of other players competing for positions on Club's roster, or if Player has engaged in personal conduct reasonably judged by Club to adversely affect or reflect on Club, then Club may terminate this contract. In addition, during the period any salary cap is legally in effect, this contract may be terminated if, in Club's opinion, Player is anticipated to make less of a contribution to Club's ability to

compete on the playing field than another player or players whom Club intends to sign or attempts to sign, or another player or players who is or are already on Club's roster, and for whom Club needs room.

12. TERMINATION. The rights of termination set forth in this contract will be in addition to any other rights of termination allowed either party by law. Termination will be effective upon the giving of written notice, except that Player's death, other than as a result of injury incurred in the performance of his services under this contract, will automatically terminate this contract. If this contract is terminated by Club and either Player or Club so requests, Player will promptly undergo a complete physical examination by the Club physician.

13. INJURY GRIEVANCE. Unless a collective bargaining agreement in existence at the time of termination of this contract by Club provides otherwise, the following Injury Grievance procedure will apply: If Player believes that at the time of termination of this contract by Club he was physically unable to perform the services required of him by this contract because of an injury incurred in the performance of his services under this contract, Player may, within 60 days after examination by the Club physician, submit at his own expense to examination by a physician of his choice. If the opinion of Player's physician with respect to his physical ability to perform the services required of him by this contract is contrary to that of the Club's physician, the dispute will be submitted within a reasonable time to final and binding arbitration by an arbitrator selected by Club and Player or, if they are unable to agree, one selected in accordance with the procedures of the American Arbitration Association on application by either party.

14. RULES. Player will comply with and be bound by all reasonable Club rules and regulations in effect during the term of this contract which are not inconsistent with the provisions of this contract or of any collective bargaining agreement in existence during the term of this contract. Player's attention is also called to the fact that the League functions with certain rules and procedures expressive of its operation as a joint venture among its member clubs and that these rules and practices may affect Player's relationship to the League and its member clubs independently of the provisions of this contract.

15. INTEGRITY OF GAME. Player recognizes the detriment to the League and professional football that would result from impairment of public confidence in the honest and orderly conduct of NFL games or the integrity and good character of NFL players. Player therefore acknowledges his awareness that if he accepts a bribe or agrees to throw or fix an NFL game; fails to promptly report a bribe offer or an attempt to throw or fix an NFL game; bets on an NFL game; knowingly associates with gamblers or gambling activity; uses or provides other players with stimulants or other drugs for the purpose of attempting to enhance on-field performance; or is guilty of any other form of conduct reasonably judged by the League Commissioner to be detrimental to the League or professional football, the Commissioner will have the right, but only after giving Player the opportunity for a hearing at which he may be represented by counsel of his choice, to

fine Player in a reasonable amount; to suspend Player for a period certain or indefinitely; and/or to terminate this contract.

16. EXTENSION. Unless this contract specifically provides otherwise, if Player becomes a member of the Armed Forces of the United States or any other country, or retires from professional football as an active player, or otherwise fails or refuses to perform his services under this contract, then this contract will be tolled between the date of Player's induction into the Armed Forces, or his retirement, or his failure or refusal to perform, and the later date of his return to professional football. During the period this contract is tolled, Player will not be entitled to any compensation or benefits. On Player's return to professional football, the term of this contract will be extended for a period of time equal to the number of seasons (to the nearest multiple of one) remaining at the time the contract was tolled. The right of renewal, if any, contained in this contract will remain in effect until the end of any such extended term.

17. ASSIGNMENT. Unless this contract specifically provides otherwise, Club may assign this contract and Player's services under this contract to any successor to Club's franchise or to any other Club in the League. Player will report to the assignee Club promptly upon being informed of the assignment of his contract and will faithfully perform his services under this contract. The assignee club will pay Player's necessary traveling expenses in reporting to it and will faithfully perform this contract with Player.

18. FILING. This contract will be valid and binding upon Player and Club immediately upon execution. A copy of this contract, including any attachment to it, will be filed by Club with the League Commissioner within 10 days after execution. The Commissioner will have the right to disapprove this contract on reasonable grounds, including but not limited to an attempt by the parties to abridge or impair the rights of any other club, uncertainty or incompleteness in expression of the parties' respective rights and obligations, or conflict between the terms of this contract and any collective bargaining agreement then in existence. Approval will be automatic unless, within 10 days after receipt of this contract in his office, the Commissioner notifies the parties either of disapproval or of extension of this 10-day period for purposes of investigation or clarification pending his decision. On the receipt of notice of disapproval and termination, both parties will be relieved of their respective rights and obligations under this contract.

19. DISPUTES. During the term of any collective bargaining agreement, any dispute between Player and Club involving the interpretation or application of any provision of the NFL collective bargaining agreement or this contract will be submitted to final and binding arbitration in accordance with the procedure called for in any collective bargaining agreement in existence at the time the event giving rise to any such dispute occurs.

20. NOTICE. Any notice, request, approval or consent under this contract will be sufficiently given if in writing and delivered in person or mailed (certified or first class) by

one party to the other at the address set forth in this contract or to such other address as the recipient may subsequently have furnished in writing to the sender.

21. OTHER AGREEMENTS. This contract, including any attachment to it, sets forth the entire agreement between Player and Club and cannot be modified or supplemented orally. Player and Club represent that no other agreement, oral or written, except as attached to or specifically incorporated in this contract, exists between them. The provisions of this contract will govern the relationship between Player and Club unless there are conflicting provisions in any collective bargaining agreement in existence during the term of this contract, in which case the provisions of the collective bargaining agreement will take precedence over conflicting provisions of this contract relating to the rights or obligations of either party.

22. LAW. This contract is made under and shall be governed by the laws of the State of

_____ .

23. WAIVER AND RELEASE. Player waives and releases: (i) any claims relating to the 2011 lockout; (ii) any antitrust claims relating to the Draft, restrictions on free agency, franchise player designations, transition player designations, the Entering Player Pool, the Rookie Compensation Pool, or any other term or condition of employment relating to conduct engaged in prior to the date of this Agreement; and (iii) any claims relating to conduct engaged in pursuant to the express terms of any collective bargaining agreement during the term of any such agreement. This waiver and release also extends to any conduct engaged in pursuant to the express terms of the Stipulation and Settlement Agreement in *White*. This waiver and release does not waive any rights player may have to commence a grievance under the 2006 CBA or to commence a grievance or other arbitration under the 2011 CBA.

24. OTHER PROVISIONS.

    (a)    Each of the undersigned hereby confirms that (i) this contract, renegotiation, extension or amendment sets forth all components of the player's remuneration for playing professional football (whether such compensation is being furnished directly by the Club or by a related or affiliated entity); and (ii) there are not undisclosed agreements of any kind, whether express or implied, oral or written, and there are no promises, undertakings, representations, commitments, inducements, assurances of intent, or understandings of any kind that have not been disclosed to the NFL involving consideration of any kind to be paid, furnished or made available to Player or any entity or person owned or controlled by, affiliated with, or related to Player, either during the term of this contract or thereafter.

    (b)    Each of the undersigned further confirms that, except insofar as any of the undersigned may describe in an addendum to this contract, to the best of their knowledge, no conduct in violation of the Anti-Collusion rules took place with respect to this contract. Each of the undersigned further confirms that nothing in this contract is designed or intended to defeat or circumvent any provisions of the collective bargaining agreement dated August 4, 2011, including but not limited to the Rookie Compensation

Pool and Salary Cap provisions; however, any conduct permitted by that Agreement shall not be considered a violation of this confirmation.

(c) PERFORMANCE-BASED PAY. Player's attention is called to the fact that he may be entitled to Performance-Based Pay in accordance with the procedures outlined in Article 28, and that his eligibility for such pay is based on a formula that takes into account his playtime percentage and compensation

25. SPECIAL PROVISIONS. THIS CONTRACT is executed in six (6) copies. Player acknowledges that before signing this contract he was given the opportunity to seek advice from or be represented by persons of his own selection.

| | |
|---|---|
| _____ | `_____ |
| PLAYER | CLUB |
| _____ | _____ |
| Home Address | By |
| _____ | _____ |
| Telephone Number | Club Address |
| _____ | _____ |
| Date | Date |

_____
PLAYER'S AGENT

_____
Address

_____
Telephone Number

_____
Date

Copy Distribution:
    White-League Office    Yellow-Player
    Green-Member Club    Blue-Management Council
    Gold-NFLPA    Pink-Player Agent

# Exhibit D – Initiation Letter



NATIONAL FOOTBALL LEAGUE

Lawrence P. Ferazani, Jr.
*Senior Vice President of Labor*
*Litigation & Policy*

July 20, 2018

<u>Via Email</u>

System Arbitrator Stephen Burbank
University of Pennsylvania Law School
3400 Chestnut Avenue
Philadelphia, PA 19104

      Re:    <u>Malik McDowell: Forfeiture Action</u>

Dear System Arbitrator Burbank,

      On behalf of the Seattle Seahawks ("Seahawks" or "Club"), the NFL Management Council initiates this proceeding against Mr. Malik McDowell pursuant to Article 15 of the NFL Collective Bargaining Agreement ("CBA"). The Management Council requests that you find Mr. McDowell in breach of his NFL Player Contract due to his engagement in an activity with significant risk of personal injury which did in fact cause him to sustain an injury that prevented him, and continues to prevent him, from performing the services required by his contract. The Management Council further requests that you apply the forfeiture provision in the Signing Bonus Addendum of the contract and Article 4, Section 9 of the CBA to find that Mr. McDowell has forfeited his entitlement to the Signing Bonus and order him to return all Signing Bonus money paid to date.

      Mr. McDowell signed an NFL Player Contract with the Seattle Seahawks on May 30, 2017. Paragraph 3 of that contract read:

      **Other Activities.** Without prior written consent of the Club, **Player will not** play football or engage in activities related to football otherwise than for Club or **engage in any activity other than football which may involve a significant risk of personal injury.** Player represents that he has special, exceptional and unique knowledge, skill, ability, and experience as a football player, the loss of which cannot be estimated with any certainty and cannot be fairly or adequately compensated by damages. Player therefore agrees that Club will have the right, in addition to any other right which Club may possess, to enjoin Player by appropriate proceedings from playing football or engaging in football-related activities other than for Club or from engaging in any activity other

System Arbitrator Stephen Burbank
July 20, 2018
Page 2

than football which may involve a significant risk of personal injury.
(emphasis added)

The contract also contained a Signing Bonus Addendum that required the Club to
pay Mr. McDowell a Signing Bonus of $3,198,476, which would be paid in four
installments.  The Seahawks paid Mr. McDowell $1,598,476 on or before June 2,
2017 and $800,000 on July 14, 2017, for a total of $2,398,476.  The Addendum
stated, "Player shall be subject to forfeiture of Signing Bonus or Salary to the
maximum extent permitted under Article 4, Section 9 of the NFL Collective
Bargaining Agreement, dated August 4, 2011."



In July of 2017 Mr. McDowell was riding an All-Terrain Vehicle ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  As a result of the injuries sustained in that
accident, Mr. McDowell was unable to perform the services required by his NFL
Player Contract and placed on the Non-Football Injury ("NFI") list on August 5,
2017.  Mr. McDowell remained on the NFI list through the end of the 2017 NFL
Season.  By agreement with the player and the NFL Players Association, the
Club withheld payment of the final two tranches of the Signing Bonus, while the
parties determined whether Mr. McDowell would be able to continue his NFL
career.

Following the end of the 2017 NFL Season, Mr. McDowell was again
examined by Dr. Stan Herring, the Club's physiatrist.[1] ▮▮▮▮▮▮▮▮

---

[1] Dr. Herring's specialty is physical medicine and rehabilitation focusing on
musculoskeletal and sports medicine with an emphasis on spinal disorders and
concussions. He is a professor at the University of Washington in the
Departments of Rehabilitation Medicine, Orthopaedics and Sports Medicine and
Neurological Surgery and Director of Sports, Spine and Orthopaedic Health for
UW Medicine.  Dr. Herring is also Co-Medical Director of the Seattle Sports
Concussion Program.

System Arbitrator Stephen Burbank
July 20, 2018
Page 3

    Mr. McDowell's breach of paragraph 3 of his NFL Player Contract has deprived the Seahawks of his services under that contract.  Pursuant to Article 4, Section 9 of the CBA, a player who "is unavailable to the team due to a nonfootball injury that resulted from a material breach of paragraph 3 of his NFL Player Contract" shall be required to forfeit Signing Bonus for each League Year in which that breach occurs.  In this case, Mr. McDowell's violation of Paragraph 3 of his contract has resulted in his inability to perform a single day under that contract.

    As such, the NFL Management Council, on behalf of the Seahawks, respectfully requests an Order finding that Mr. McDowell has forfeited his right to the entire Signing Bonus and requiring Mr. McDowell to return all Signing Bonus monies received to date, to wit: $2,398,476 and such other and further relief as the System Arbitrator deems appropriate.

Respectfully Submitted,

Lawrence P. Ferazani, Jr.

cc:    John Schneider
       Matt Thomas
       Ned Ehrlich

Exhibit E –
Amended Initiation
Letter



## NATIONAL FOOTBALL LEAGUE

Lawrence P. Ferazani, Jr.
*Senior Vice President, Labor Relations*
*NFL Management Council, General Counsel*

February 19, 2019

**Via Email**

System Arbitrator Stephen Burbank
University of Pennsylvania Law School
3400 Chestnut Avenue
Philadelphia, PA 19104

Re:   ***AMENDED***[1] Malik McDowell: Forfeiture Action

Dear System Arbitrator Burbank,

On behalf of the Seattle Seahawks ("Seahawks" or "Club"), the NFL Management Council initiates this proceeding against Mr. Malik McDowell pursuant to Article 15 of the NFL Collective Bargaining Agreement ("CBA"). The Management Council requests that you find Mr. McDowell in breach of his NFL Player Contract due to his engagement in an activity that may involve significant risk of personal injury and which did in fact cause him to sustain a personal injury that prevented him, and continues to prevent him, from performing the services required by his contract. The NFL Management Council further requests that you apply the forfeiture provision in the Signing Bonus Addendum of the contract and Article 4, Section 9 of the CBA to find that to date Mr. McDowell has forfeited his entitlement to the Signing Bonus Allocations for 2017 and 2018 and order him to pay $799,238 to the Seahawks.

Mr. McDowell signed an NFL Player Contract with the Seattle Seahawks on May 30, 2017. Paragraph 3 of that contract read:

> **Other Activities.** Without prior written consent of the Club, **Player will not** play football or engage in activities related to football otherwise than for Club or **engage in any activity other than football which may involve a significant risk of personal injury**. Player represents that he has special, exceptional and unique knowledge, skill, ability, and experience as a football player, the loss of which cannot be estimated with any certainty and cannot be fairly or adequately compensated by damages. Player therefore

---

[1] The NFL Management Council hereby withdraws the original forfeiture action initiated against Mr. McDowell on July 20, 2018.

System Arbitrator Stephen Burbank
February 19, 2019
Page 2

        agrees that Club will have the right, in addition to any other right
which Club may possess, to enjoin Player by appropriate
proceedings from playing football or engaging in football-related
activities other than for Club or from engaging in any activity other
than football which may involve a significant risk of personal injury.
(emphasis added)

        The contract also contained a Signing Bonus Addendum that required the
Club to pay Mr. McDowell a Signing Bonus of $3,198,476, which would be paid in
four installments.  The Seahawks paid Mr. McDowell $1,598,476 on or before
June 2, 2017 and $800,000 on July 14, 2017, for a total of $2,398,476.  The
Addendum stated, "Player shall be subject to forfeiture of Signing Bonus or
Salary to the maximum extent permitted under Article 4, Section 9 of the NFL
Collective Bargaining Agreement, dated August 4, 2011."

        In July of 2017 Mr. McDowell was riding an All-Terrain Vehicle w▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  As a result of the injuries sustained in that
accident, Mr. McDowell was unable to perform the services required by his NFL
Player Contract and placed on the Non-Football Injury ("NFI") list on August 5,
2017.  Mr. McDowell remained on the NFI list through the end of the 2017 NFL
Season.  By agreement with the player and the NFL Players Association, the
Club withheld payment of the final two tranches of the Signing Bonus (totaling
$800,000), while the parties determined whether Mr. McDowell would be able to
continue his NFL career.

        Following the end of the 2017 NFL Season, Mr. McDowell was again
examined by Dr. Stan Herring, the Club's physiatrist.[2]



---

[2] Dr. Herring's specialty is physical medicine and rehabilitation focusing on
musculoskeletal and sports medicine with an emphasis on spinal disorders and
concussions. He is a professor at the University of Washington in the
Departments of Rehabilitation Medicine, Orthopaedics and Sports Medicine and
Neurological Surgery and Director of Sports, Spine and Orthopaedic Health for
UW Medicine.  Dr. Herring is also Co-Medical Director of the Seattle Sports
Concussion Program.

System Arbitrator Stephen Burbank
February 19, 2019
Page 3



Mr. McDowell's breach of paragraph 3 of his NFL Player Contract has deprived the Seahawks of his services under that contract. Pursuant to Article 4, Section 9 of the CBA, a player who "is unavailable to the team due to a nonfootball injury that resulted from a material breach of paragraph 3 of his NFL Player Contract" shall be required to forfeit Signing Bonus for each League Year in which that breach occurs. In this case, Mr. McDowell's violation of Paragraph 3 of his contract has resulted in his inability to perform a single day under that contract. To date, Mr. McDowell has forfeited his right to the Signing Bonus Allocations for 2017 and 2018. McDowell's Signing Bonus is allocated at $799,619 per year. As such, the NFL Management Council, on behalf of the Seahawks, respectfully requests an Order finding that Mr. McDowell has forfeited his right to the 2017 and 2018 Signing Bonus Allocations (totaling $1,599,238) and requiring Mr. McDowell to return $799,238 to the Seahawks, which amount represents the $1,599,238 forfeited, less the $800,000 of the Signing Bonus that the Club withheld.

The Seahawks reserve the right to initiate a separate enforcement proceeding seeking forfeiture of McDowell's remaining Signing Bonus Allocations if, in the opinion of the Seahawks' team physician, McDowell ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Respectfully Submitted,

Lawrence P. Ferazani, Jr.

cc:    Ned Ehrlich

345 Park Avenue, New York, NY 10154
Tel 212.450.2357
Larry.Ferazani@NFL.com

# Exhibit F –
# Excerpts of Arbitration
# Hearing Transcript

NFL SYSTEM ARBITRATION
MAILK MCDOWELL on 02/27/2019

```
 1

 2

 3

 4

 5   _____

 6   NATIONAL FOOTBALL LEAGUE
     MANAGEMENT COUNCIL
 7
             Claimant,
 8
             v.
 9
     NATIONAL FOOTBALL LEAGUE
10   PLAYERS ASSOCIATION,

11           Respondent.

12   _____

13                              BEFORE SYSTEM ARBITRATOR
14                              STEPHEN B. BURBANK

15                              Re:  Malik McDowell

16

17

18

19

20

21

22

23

24

25
```

```
 1            APPEARANCES:

 2

 3    For the Claimant:

 4
      SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
 5
      BY:  ANTHONY DREYER, ESQ.
 6         MICHAEL FOLGER, ESQ.

 7    4 Times Square
      New York, New York  10036
 8    212.735.2157
      anthony.dreyer@skadden.com
 9    michael.folger@skadden.com

10
      NFL MANAGEMENT COUNCIL
11
      MOLLY DELANEY, NATIONAL FOOTBALL LEAGUE
12    MATT THOMAS, SEATTLE SEAHAWKS
      molly.delaney@nfl.com
13

14

15
      For the Respondent:
16
      NFL PLAYERS UNION
17
      BY:  NED EHRLICH, ESQ.
18    ned.ehrlich@nflpa.com

19

20

21    Also Present:  System Arbitrator Stephen B. Burbank
                     Malik McDowell
22                   Joya Crowe

23

24                      --oOo--
25
```

1   afternoon, Malik.

2        MR. McDOWELL:  Good morning -- afternoon.

3        MR. DREYER:  Professor Burbank, for the benefit of

4   Mr. McDowell and his mother, would it be helpful for us to

5   go through the introduction again of who's on the call?

6        ARBITRATOR BURBANK:  I think that's probably

7   appropriate, and then I'll say what the purpose of the call

8   is.  Then we can get into it.

9        MR. DREYER:  Thank you.

10        And, Mr. McDowell, and -- forgive me.

11        Is it Ms. McDowell?

12        MS. CROWE:  No.  Crowe.

13        MR. DREYER:  My name is Anthony Dreyer.  I'm with

14   the firm of Skadden, Arps, Slate, Meagher & Flom.  We're

15   representing the National Football League Management

16   Council.  I'm here in New York with my colleague Michael

17   Folger.  Joining me on the call from the National Football

18   League Management Council is Molly Delaney as well as Matt

19   Thomas from the Seattle Seahawks.

20        Good afternoon to you, and thank you for joining.

21        MR. EHRLICH:  Ned Ehrlich from the NFL Players

22   Association on behalf of Malik McDowell and the NFL Players

23   Association.

24        ARBITRATOR BURBANK:  Okay.  And this is System

25   Arbitrator Stephen Burbank, and I convened this telephone

1   conference at the parties' request to consider a Proposed

2   Order -- to consider entering a Proposed Order in the

3   proceeding that the Management Council, on behalf of the

4   Seahawks, initiated against Mr. Malik for forfeiture of

5   Signing Bonus allocations pursuant to an alleged breach of

6   Paragraph 3 of the Player Contract.

7          My understanding, Mr. Malik, is that you do not

8   contest the forfeiture of the 2017 and 2018 Signing Bonus

9   allocations; is that correct?

10          MR. McDOWELL:  That's right.

11          ARBITRATOR BURBANK:  Do you understand that the

12   Order that I've been asked to sign reserves the right of the

13   Seahawks to seek forfeiture of the 2019 and 2020 Signing

14   Bonus allocations if the Seahawks' physician concludes that

15   ██████████████████████████████████████?

16          MR. McDOWELL:  I understand.

17          MS. CROWE:  Wait a minute.  2019 and 2020?

18          MR. EHRLICH:  And we have reserved the right to

19   contest that, ████████████████████████████

20   ████████████████████████████████████████

21   ██████████.

22          ARBITRATOR BURBANK:  Right.

23          My understanding, Mr. Malik, is that that issue has

24   been put off to the future, that the Order, apart from

25   preserving that right, simply deals with 2017 and 2018.

1          MR. McDOWELL:  Okay.

2          MR. EHRLICH:  That is correct.

3          ARBITRATOR BURBANK:  Do you have any questions,

4     Mr. McDowell, about the proceeding?

5          Mr. McDOWELL:  No.  I've basically been told what's

6     going on.

7          ARBITRATOR BURBANK:  If you have any questions or

8     concerns or issues, I wish you would raise them.

9          Mr. McDOWELL:  I don't.

10         ARBITRATOR BURBANK:  Okay.  Let me then ask counsel

11    if you have any matters that you want to raise that I should

12    hear before deciding whether or not to sign this Order.

13         MR. EHRLICH:  This is Ned Ehrlich from the NFL

14    Players Association.  We don't have any questions as it

15    pertains to the Order that is being proposed.  As indicated

16    earlier, we do reserve the right, if there is any subsequent

17    proceeding regarding the 2019 or 2020, to address the issues

18    of Mr. McDowell's ongoing ability or inability to play.

19         ARBITRATOR BURBANK:  Right.  I understand that, and

20    Mr. McDowell said he understood it, as well.  Anything --

21         Mr. Dreyer?

22         MR. DREYER:  Thank you, Professor.  Nothing with

23    respect to the substance of the Order.  As we previously

24    indicated, if you are inclined to enter the Order, we would

25    respectfully request that it be entered on or before

1    March 13th in the current league year, but otherwise, we

2    certainly have no further questions.

3            We thank you for your attention in this matter.

4            ARBITRATOR BURBANK:  Okay.  The Order is going to

5    be -- I will enter the Order, and I'm going to enter it

6    today; and I will send to all of you on the email trail a

7    scanned copy of the Executed Order, just the signature page.

8            MR. EHRLICH:  Thank you, your Honor.

9            MR. DREYER:  Thank you.

10           MR. McDOWELL:  Does that mean I'll be released

11   today?

12           ARBITRATOR BURBANK:  According to the Order --

13   according to the Order, Mr. McDowell, you will be released

14   after the Order is executed, which I don't know whether it

15   will be today or tomorrow.

16           MR. McDOWELL:  Okay.

17           ARBITRATOR BURBANK:  Anything else?

18           MR. McDOWELL:  No.

19           MR. EHRLICH:  No, sir.

20           MR. DREYER:  As a logistical --

21           ARBITRATOR BURBANK:  Well, thank you very much.

22           MR. DREYER:  Forgive me, Professor.  I was going to

23   say, as a logistical matter, I will, after the call, provide

24   everybody with the full contact information for the court

25   reporter and will provide her your email and Mr. Ehrlich's

```
 1    email as well so she can circulate the transcript once it's

 2    ready.

 3            ARBITRATOR BURBANK:  That would be great.  Thank

 4    you.

 5            Okay.  I wish you all a pleasant evening.  Thank

 6    you.

 7            THE REPORTER:  Mr. Ehrlich, are you going to want a

 8    copy?

 9            MR. EHRLICH:  Yes, I do.  This is Ned Ehrlich, and I

10    do want a copy.

11            THE REPORTER:  Thank you.

12            MR. DREYER:  Thank you, everyone.

13            MR. EHRLICH:  Thank you.

14            MS. DELANEY:  Thank you.

15            MS. MCDOWELL:  Thank you.

16            (Thereupon, the proceedings were concluded at

17    1:23 p.m.)

18

19

20

21

22                          --oOo--

23

24

25
```

```
 1        I, AMANDA SALANITRO, a Certified Shorthand Reporter and

 2   Registered Notary Public of the State of New York, duly

 3   authorized to administer oaths, do hereby certify:

 4

 5        That the foregoing proceedings were taken before me at

 6   the time and place herein set forth; that a record of the

 7   proceedings was made by me using machine shorthand which was

 8   thereafter transcribed under my direction; that the

 9   foregoing transcript is a true record of the testimony

10   given.

11

12        I further certify I am neither financially interested

13   in the action nor a relative or employee of any attorney or

14   party to this action.

15

16        WITNESS WHEREOF, I have this date subscribed my name.

17        Dated:  February 27, 2019

18

19

20

21

22        AMANDA SALANITRO, CSR NO. 14035

23

24                        --oOo--

25
```

NFL SYSTEM ARBITRATION
MAILK MCDOWELL on 02/27/2019

Index: 13th..deciding

**1**

13th   9:1

1:23   10:17

**2**

2017   7:8,25

2018   7:8,25

2019   7:13,
 17 8:17

2020   7:13,
 17 8:17

**3**

3   3:17 7:6

**A**

ability   8:18

acceptable
 4:6

activities
 7:15

address   8:17

afternoon
 3:3 6:1,2,
 20

alleged   3:17
 7:5

allocations
 3:16 7:5,
 9,14

Anthony   3:3
 6:13

apologize
 3:21 4:22
 5:7,18

Apparently
 3:20

arbitrator
 3:11,12,24
 4:21 5:15,
 18,19 6:6,
 24,25
 7:11,22
 8:3,7,10,
 19 9:4,12,
 17,21 10:3

Arps   3:4
 6:14

Association
 3:10 6:22,
 23 8:14

attention
 9:3

awake   3:20

**B**

back   4:13
 5:7

basically
 8:5

behalf   3:4,
 10,15 6:22
 7:3

benefit   6:3

Bonus   3:16
 7:5,8,14

breach   3:17
 7:5

Burbank
 3:11,12,24
 4:21 5:18,
 19 6:3,6,
 24,25
 7:11,22
 8:3,7,10,
 19 9:4,12,
 17,21 10:3

**C**

call   4:7,13
 5:2,9,13
 6:5,7,17
 9:23

calling   3:19

capable   7:20

check   4:8

circulate
 10:1

client   4:8

Club's   7:15

colleague
 3:6 6:16

Completely
 4:24

concerns   8:8

concluded
 10:16

concludes
 7:14

conference
 3:13 7:1

contact   9:24

contest   4:4
 7:8,19

Contract
 3:17 7:6

convened
 3:12 6:25

copy   9:7
 10:8,10

correct   7:9
 8:2

Council   3:5,
 7,15 6:16,
 18 7:3

counsel   5:21
 8:10

court   9:24

Crowe   5:12,
 16,24 6:12
 7:17

current   9:1

**D**

deals   7:25

deciding
 8:12

NFL SYSTEM ARBITRATION
MAILK MCDOWELL on 02/27/2019  Index: declaration..Malik

declaration
  4:3

Delaney  3:6
  4:10 6:18
  10:14

determine
  7:20

Dreyer  3:3,
  23,25 4:8,
  12,15,20,
  24 5:1,4,
  10,22 6:3,
  9,13 8:21,
  22 9:9,20,
  22 10:12

drove  5:8

E

earlier  8:16

Ehrlich  3:9,
  18,22 4:6,
  13,19,22,
  25 5:2,5,
  11,14,17,
  21,23,25
  6:21 7:18
  8:2,13
  9:8,19
  10:7,9,13

Ehrlich's
  9:25

email  9:6,25
  10:1

enter  8:24

9:5

entered  8:25

entering  7:2

entry  4:4

evening  10:5

Everybody's
  5:14

everyone's
  4:22

executed
  9:7,14

experts  7:20

F

firm  3:4
  6:14

Flom  6:14

Folger  3:6
  6:17

football
  6:15,17
  7:15

forfeiture
  3:16 7:4,
  8,13

forgive  6:10
  9:22

full  9:24

future  7:24

G

give  4:17

good  3:3,25
  4:11 5:25
  6:2,20

great  4:12
  5:17 10:3

guess  3:20
  4:16

H

Hang  4:25

hear  8:12

helpful  6:4

hold  3:18
  4:14

Honor  3:19
  9:8

house  5:8

I

inability
  8:18

inclined
  8:24

information
  9:24

initiated
  3:14 7:4

introduction

6:5

issue  7:23

issues  8:8,
  17

J

Jeffrey  7:19

join  4:2
  5:7

joining  3:6
  6:17,20

Joya  5:11,
  23

K

Kutcher  7:19

L

lawyers  5:15

league  6:15,
  18 9:1

logistical
  9:20,23

loop  5:3,12

M

make  4:2

Malik  3:10,
  15 5:16,
  24,25 6:1,
  22 7:4,7,

NFL SYSTEM ARBITRATION
MAILK MCDOWELL on 02/27/2019 Index: Management..representing

| | | | |
|---|---|---|---|
| 23 | mother 6:4 | 7:15 | 8:22 9:22 |
| **Management** | **mother's** | **parties'** | **proposed** |
| 3:5,7,14 | 3:19 | 3:13 7:1 | 3:14 7:1,2 |
| 6:15,18 | **move** 4:11 | **pertains** | 8:15 |
| 7:3 | | 8:15 | **provide** |
| **March** 9:1 | **N** | **phone** 3:6,21 | 9:23,25 |
| **Matt** 3:7 | **National** | **physician** | **publicly** 4:8 |
| 4:9 6:18 | 6:15,17 | 7:14 | **purpose** 6:7 |
| **matter** 9:3, | **Ned** 3:9,21, | **picks** 4:18 | **pursuant** 7:5 |
| 23 | 23 4:2,15 | **play** 8:18 | **put** 3:18 |
| **matters** 8:11 | 5:10 6:21 | **Player** 3:17 | 4:14 7:24 |
| **Mcdowell** | 8:13 10:9 | 7:6 | **Q** |
| 3:10,15 | **NFL** 3:4,7, | **Player's** | **question** |
| 4:4 6:2,4, | 9,14 6:21, | 3:19 | 3:25 |
| 10,11,22 | 22 8:13 | **Players** 3:10 | **questions** |
| 7:10,16 | **O** | 6:21,22 | 8:3,7,14 |
| 8:1,4,5,9, | | 8:14 | 9:2 |
| 20 9:10, | **office** 5:3 | **playing** 7:21 | **R** |
| 13,16,18 | **ongoing** 8:18 | **pleasant** | |
| 10:15 | **order** 3:14 | 10:5 | **raise** 8:8,11 |
| **Mcdowell's** | 4:5 7:2, | **preserving** | **reach** 5:6 |
| 8:18 | 12,24 | 7:25 | **ready** 5:23 |
| **Meagher** 6:14 | 8:12,15, | **previously** | 10:2 |
| **medical** 7:20 | 23,24 9:4, | 8:23 | **record** 4:16 |
| **Michael** 3:6 | 5,7,12,13, | **proceed** 3:24 | **released** |
| 6:16 | 14 | **proceeding** | 9:10,13 |
| **minute** 4:17 | **P** | 3:14 7:3 | **reporter** |
| 7:17 | | 8:4,17 | 9:25 10:7, |
| **Molly** 3:6 | **p.m.** 10:17 | **proceedings** | 11 |
| 4:9 6:18 | **Paragraph** | 10:16 | **representing** |
| **moment** 4:14 | 3:17 7:6 | **Professor** | 6:15 |
| **morning** 5:25 | **participate** | 4:1,20 6:3 | |
| 6:2 | | | |

NFL SYSTEM ARBITRATION
MAILK MCDOWELL on 02/27/2019          Index: request..York

request   3:13
   7:1 8:25

reserve   8:16

reserved
   7:18

reserves
   7:12

respect   8:23

respectfully
   8:25

responded
   4:25

**S**

scanned   9:7

Seahawks
   3:8,15
   6:19 7:4,
   13

Seahawks'
   7:14

Seattle   3:8
   6:19

seek   7:13

seeking   3:16

send   9:6

sense   4:2

she'll   5:9

sign   7:12
   8:12

signature

9:7

Signing   3:16
   7:5,8,13

simply   7:25

sir   9:19

Skadden   3:4
   6:14

Slate   6:14

son's   5:8

stay   4:16

Stephen   3:12
   6:25

submit   4:3

subsequent
   8:16

substance
   8:23

supplemental
   4:3

System   3:11
   6:24

**T**

telephone
   3:13 6:25

Thomas   3:7
   6:19

time   4:23

today   9:6,
   11,15

told   8:5

tomorrow
   9:15

totally   5:22

trail   9:6

transcript
   10:1

turned   3:21

**U**

understand
   5:20,22
   7:11,16
   8:19

understanding
   7:7,23

understood
   4:24 8:20

utilizing
   7:19

**W**

Wait   7:17

wasting   4:22

**Y**

year   9:1

York   3:5
   6:16